# FRANKLIN TELEGRAPH COMPANY *v.* HARRISON.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

No. 319.  Argued April 19, 1892. — Decided May 16, 1892.

A telegraph company gave to H. & Co. the right to put up at their own expense and maintain and use a wire upon the poles of the company between New York and Philadelphia, and to permit four other parties to use the same with priority of right, the company to have the use of the wire when not so employed. The company agreed to keep and maintain the wire when accepted by it, and to bear all expenses of batteries, etc., connected with its working and to permit such use by H. & Co. and four other persons for a period of ten years. At the end of that time the wire was to be the property of the company, when the company agreed " to lease the same " to H. & Co. " for the use of themselves and such other four persons " " for the sum of $600 per annum, payable quarterly, and upon the same terms in all other respects as if

the wire had not been given up" to the company. The wire was put up by H. & Co. and used by them and "four other persons" for the term of ten years without compensation, and after that at the agreed compensation. The company then notified H. & Co. that the use of the wire by H. & Co. and the four other persons had become such as to exclude the company from all use of it, which was not contemplated by the original contract, and that the agreement would be terminated by the company. H. & Co. filed their bill to restrain the company from so doing. *Held,*

(1) That H. & Co. and their licensees, after the expiration of the ten years, were entitled to the same absolute use of the wire which they enjoyed before the wire was given up to the company, on payment of $600 per annum, payable quarterly;

(2) That the facts disclosed no hardship which would justify a court of equity, in the exercise of its judicial discretion, to refuse the relief asked for;

(3) That the plaintiffs were entitled to such relief in equity.

THE case is stated in the opinion.

*Mr. John F. Dillon* and *Mr, Rush Taggart* for appellants.

*Mr. R. C. McMurtrie* and *Mr. S. S. Hollingsworth* for appellees.

MR. JUSTICE HARLAN delivered the opinion of the court.

This suit was brought to obtain a decree restraining the appellants, the defendants below, from terminating or in anywise interfering with the use by the appellees, the plaintiffs below, of a telegraph wire upon the poles of the defendants between Philadelphia and New York, and requiring the defendants to maintain such wire in good working order for the use of plaintiffs and their licensees.

The plaintiffs base their claim to this relief upon a written contract made in 1867 with the Franklin Telegraph Company, a Massachusetts corporation, acting for itself and other companies. As the case depends upon the construction of that contract, it is given in full, as follows:

"Memorandum of agreement made this 21st day of May, 1867, by the Franklin Telegraph Company for their own

account, and on behalf of the Insulated Lines Telegraph Company, of the first part, and Thomas Harrison, M. Leib Harrison, John Harrison, George L. Harrison, Jr., and Thomas S. Harrison, trading as Harrison Brothers & Co., manufacturing chemists of Philadelphia, of the other part:

"Witnesseth, That the party of the first part, for and in consideration of the relinquishment by the parties of the second part to the party of the first part of a valuable contract made by the party of the second part with the Insulated Lines Telegraph Company, hereby grants to the party of the second part the right to put up, maintain and use a telegraphic wire between the cities of New York and Philadelphia, upon the poles of the Franklin Telegraph Company, or of the Insulated Lines Telegraph Company, or of those persons or corporations whose property has lately been purchased by or consolidated into the stock of the party of the first part. And the party of the second part are privileged at their option to allow four other parties to use the same with them, they and the licensees aforesaid to have priority in the use of the said wire, for transmission of messages free of all expense. The party of the first part to have the use of the same when not so employed. And in consideration of allowing the use of said wire to the party of the first part when they, the said parties of the second part and the licensees aforesaid, are not using the same, the party of the first part agrees, said wire. having first been put up to the acceptance of J. G. Smithe, the superintendent of said Franklin Telegraph Company, and accepted by him, to keep and maintain at their own expense the said wire in good working order to and between the offices of the parties of the first part in New York and Philadelphia, and between said offices and the places of business of the parties of the second part and such four other persons or firms in the said cities of New York and Philadelphia, all expenses of batteries, &c., connected with the working of said wire to be paid by the parties of the first part. At the expiration of ten years the party of the second part agree that their private wire shall belong to the parties of the first part; after which time the parties of the first part agree to lease the same to

the party of the second part, for the use of themselves and such other four persons or firms as the party of the second part shall suffer and permit or license to use the same, for the sum of six hundred dollars per annum, payable quarterly, and upon the same terms in all other respects as if the wire had not been given up to the parties of the first part.

"The party of the second part, however, agree that no assignment by them of their right under this contract shall give their assignees the right to demand a lease of the said wire after the expiration of the ten years, which right is to be a personal privilege of the party of the second part or of that firm for the time being.

"It is further agreed that the right of giving the use of the wire to four other parties shall be exercised by the party of the second part or their assignees only by giving the same to any person or firm not being a telegraph company, a banker, or stock or exchange broker or railroad company.

"And in case the party of the second part shall procure a charter to carry on the business they are now engaged [in], or a similar business, the privileges and rights of the party of the second part shall enure to said corporation in like manner as if such corporation had been named as the party of the second part herein.

"In case of any disagreement on that or any other point embraced in this contract, the decision of the same shall be left to two disinterested persons mutually chosen by the parties hereto, with a right to call in a third as umpire, whose decision shall be final.

"In case those objections are held valid by the arbitrators and not acquiesced in by the parties of the second part, the party of the first part reserves the right to purchase the said wire at a fair valuation, to be determined by referees in the same manner as any other matter in this agreement; with the above exception, the party of the second part has the right of transfer.

"No change in the firm or firm name of the party of the second part or those interested through them by death or retirement or by addition of members to said firm or from

other cause shall vitiate the right or title of the party of the second part under this contract or destroy its continuance in full force to such new firm and the members thereof as if they were named herein.

" The parties of the second part and those interested through them are not to do other than their own legitimate mercantile and personal business. Should they be willing to transmit any other messages they are to charge the company's regular tolls and hand the same over weekly to the proper officers of said companies without discount or diminution.

" In case of a violation of this contract in this respect by the party of the second part or their licensees, they shall respectively pay the parties of the first part four times the current rates of similar messages and the expenses of recovering the same as liquidated damages, and if this should continue and be found by arbitration to have been intentionally persisted in, it shall terminate this contract against the offending party, whether Harrison Bros. & Co., or either of their licensees.

" It is agreed by the Franklin and Insulated Lines Telegraph Companies that no debts at present made or hereafter contracted shall in any way affect or injure the rights of the parties of the second part under this agreement, or impair their title to the wire put up by them on the poles of said companies.

" In case the said wire shall at any time be out of order or incapable from any cause of being used, the parties of the first part will transmit the messages of the party of the second part and their licensees from any of their offices to and from New York and Philadelphia in regular turn, with all other messages received for transmission, free of all charge and expense."

The plaintiffs are the successors in business of Harrison Brothers & Co., parties to the above contract, and entitled to all the rights conferred, and subject to all the liabilities imposed, by its provisions.

The Franklin Telegraph Company, June 14, 1876, leased all its property and franchises to the Atlantic and Pacific Tele-

graph Company, a corporation of New York, for the term of ninety-nine years from May 1, 1876; and on the 19th day of January, 1881, the latter corporation sold and transferred all its property and franchises (except the franchise to continue its corporate existence) to the Western Union Telegraph Company.

The plaintiffs, at their own expense, put up the required wire on the poles of the Franklin Telegraph Company between New York and Philadelphia. After May 21, 1877 — ten years from the date of the above contract having expired — they enjoyed its use, and paid to the Atlantic and Pacific Telegraph Company the stipulated sum of $600 per annum.

On the 20th of August, 1880, the plaintiffs received from the Atlantic and Pacific Telegraph Company a communication, in which it was said:

"In the contract entered into between your house and the Franklin Telegraph Company in May, 1867, it was contemplated that the telegraph company should have the use of the wire leased during a considerable portion of the time, in consideration of which the telegraph company were to maintain the line in working order and furnish battery power therefor. Your own business and that of your licensees has deprived us more and more of the use of this wire, until we find ourselves furnishing the exclusive use of a wire, between New York and Philadelphia, maintaining and supplying battery for it, for the sum of $600 dollars per annum. As this cannot be afforded and was not contemplated by the contract, and as the contract fixes no limit of continuance, we respectfully give notice that we shall consider it terminated from and after 21st of November next, being the end of the next quarter. Should you desire to continue the connection we shall be glad to accommodate you upon as favorable terms as can be afforded, and would like to have your decision at an early day, that we may make suitable provision for you, if desired, upon our new and substantial line now in process of construction."

To this the plaintiffs replied: "We are sorry that you still insist on your view of our rights under the contract. We had hoped that the views that we lately presented to you would,

when you came to think the matter over, convince you. We see no way, however, of settling the case except by having the meaning of the contract decided. We suggest, therefore, that an amicable suit be instituted for this purpose, and that your notice be extended so as to cover the time necessary to make a decision. If, in the meanwhile, you have any substitute to propose for the existing arrangement we shall be glad to consider it. We desire that the pleasant relations that have existed between us may not be disturbed, and think that our suggestion will meet with your approval."

Nothing further was done to interfere with the rights claimed by the plaintiffs until May 20, 1882, when they received the following notice: "You will please take notice that the Franklin Telegraph Company desires to terminate the agreement heretofore, and on the twenty-first day of May, 1867, executed between themselves and you, and that the same will be so terminated on the twenty-first day of November, 1882."

In anticipation of this threatened termination of the contract, and to prevent the consequences that would result from such action, the present suit was brought by the plaintiffs.

The defendants, in their answer, allege that the telegraphic wire, erected under the said agreement, consisted of the wire, the insulation thereof, and a cable under the North River, in order to complete the line of communication into the city of New York; that such cable became worn by long use and was no longer serviceable, so that the defendants were compelled to abandon its use, and it has since been taken up and removed; that the insulation of the wire, erected by the plaintiffs, also, became, by long use, unserviceable, and a new one was substituted by the defendants; that, finally, the wire. itself, by long use, became imperfect, unreliable, unfit for use, and was taken down; and that, before the commencement of this suit, every part of the telegraphic line erected by the plaintiffs under the above agreement, had been taken down and removed for the reasons just stated, and no part of it was now in use.

It was also alleged in the answer that the cost to the plain-

tiffs of erecting said wire could not properly have exceeded $3000, that the expense to defendants of keeping and main. taining the same in good working order, and the expenses of batteries, etc., connected with the working of the wire, which defendants paid, amounted to $600 per annum between May 21, 1867, and May 21, 1877; and that the telegraphic facilities furnished to the plaintiffs and their licensees during the same period were of the value to the plaintiffs of $600 per annum.

By the final decree of the Circuit Court, held by Mr. Justice Bradley and Judge Butler, it was ordered, adjudged and decreed that " under and by virtue of the contract or agreement made and bearing date the 21st day of May, 1867, by and between the Franklin Telegraph Company, for their own account and on behalf of the Insulated Lines Telegraph Company, of the first part, and Thomas Harrison, M. Leib Harrison, John Harrison, George L. Harrison, Junior, and Thomas S. Harrison, trading as Harrison Brothers and Company, manu · facturing chemists of Philadelphia, of the other part, the com · plainants in this suit, as successors of said Harrison Brothers and Company, are entitled, so long as the defendants, The Franklin Telegraph Company, their successors or assigns, shall keep up and maintain the line of telegraph between the cities of New York and Philadelphia mentioned in the said agreement or any telegraph line between the said cities, to an irrevocable license, subject to the payment of six hundred dollars per annum, payable quarterly; to have the use of one wire in and upon said line in the manner provided for in said agreement, for the benefit and use of their said firm of Harrison Brothers and Company, so long as the complainants or either of them shall continue to be members or a member of said firm and the said firm shall continue to carry on the business they were engaged in at the time of said agreement or a similar business, by whatever name the said firm may be called, or whether acting as a firm of individuals or under a charter of incorporation. The court therefore doth order, adjudge and decree that the defendants, the said Franklin Telegraph Company, their successors and assigns, so long as they shall continue to maintain said line of telegraph or any

telegraph line between the cities of New York and Philadelphia, do maintain in good working order a telegraph wire thereon, for the use of the said firm or corporation, so long as the complainants or either of them shall be members or a member thereof, according to the terms of said contract, and that they be enjoined from interfering with the use of said wire by the said firm or corporation in manner aforesaid."

The principal question is as to the nature of the interest the appellees had under the agreement of May 21, 1867, after the expiration of ten years from its date, when the ownership of the wire passed from Harrison Bros. & Co. to the telegraph company. It was stipulated that the company after the wire became its property should "lease the same" to Harrison Bros. & Co. "for the use of themselves and such other four persons or firms" as that firm "shall suffer and permit or license to use the same, for the sum of six hundred dollars per annum, payable quarterly, and upon the same terms in all other respects as if the wire had not been given up to" the telegraph company. The appellants insist that the agreement was only for a lease of the wire, to begin when it became the property of the telegraph company and to continue for one year; that as the appellees occupied it for that year and the next year, they became tenants from year to year; that it was in the power of the appellants to determine such tenancy at the end of any year upon notice; and that, having given proper notice, the interest of the appellees ceased.

It appears from the uncontradicted averments of the bill, as well as from the evidence, that the Franklin Telegraph Company originally owned two wires from Philadelphia to New York, and was doing a paying business; and that the Insulated Lines Telegraph Company owned four wires from Boston to New York, and four wires running south from New York to Washington through Philadelphia, but had a large bonded and floating debt, and was losing money. The latter company made overtures to the former for a consolidation, pending which inquiries were set on foot in respect to the nature of the contract between Harrison Bros. & Co. and the Insulated Lines Telegraph Company. The Franklin Telegraph

Company was unwilling to enter into the proposed consolidation, so long as that contract existed. Thereupon negotiations were commenced with Harrison Bros. & Co., which resulted in the agreement of May 21, 1867. The bill avers and the answer admits that said agreement "was made by said Franklin Telegraph Company with said Harrison Bros. & Co. for the purpose of having rescinded the said contract between the said Insulated Lines Telegraph Company and said Harrison Bros. & Co., and in order to secure the erection of a wire upon the poles of said company between New York and Philadelphia by and at the expense of said last-mentioned firm." What was the intrinsic value to that firm of the contract thus relinquished, or how necessary it was, at that time, to the interests of the Franklin Telegraph Company and of the proposed consolidated company that that contract should be surrendered and cancelled, the record does not disclose. But the agreement recites, and, therefore, the parties agree, that the contract so relinquished by Harrison Bros. & Co. was a "valuable" one. And the evidence shows that it was delivered up to the Insulated Lines Telegraph Company. At the examination of a witness, who had been the general agent of the Franklin Telegraph Company, and has directly connected with the negotiations leading up to that agreement, the plaintiffs called for the production of the contract which Harrison Bros. & Co. had relinquished. The attorney for the telegraph companies answered that he had not received previous notice to produce it, and could not do so then because it was not in his possession. This notice may have been insufficient under the strict rules of evidence, but it was within the power of defendants to have produced the contract at some subsequent date, so as to enable the court and the jury, if it was necessary to do so, to ascertain, with reasonable certainty, the real value of the privileges surrendered by Harrison Bros. & Co. in consideration of the rights given them by the contract of 1867. The contract would, perhaps, have thrown light upon the meaning of the clause by which that firm acquired the right to "lease" the wire put up by them after it became the property of the telegraph company. With that contract

before us we could, perhaps, better understand the suggestion, made in different forms, that Harrison Bros. & Co. got by the decree below privileges far greater in value than any relinquished by them, and that the contract of 1867, as interpreted by them, is a hard, unreasonable one that ought not to be enforced by a court of equity.

Looking at the written contract — which the bill alleges, and defendants insist, was made to carry out the previous agreement and understanding of the parties — it is, quite clear that, although the word " lease " is used, the parties did not intend that the plaintiffs should be subjected, after the expiration of ten years, to the strict conditions applicable to a technical lease of real estate. The contract limits the period during which appellees should be the owners of the wire, but does not limit the time during which they could, of right, use it in their business. If it was intended that Harrison Bros. & Co. — having relinquished their valuable contract with the Insulated Lines Telegraph Company, and put up the wire at their own expense — should become, after ten years, only tenants from year to year of the telegraph company, that intention, it seems to the court, would have been distinctly avowed.

The agreement is clear and specific as to the consideration which passed from the respective parties. In consideration of the relinquishment by Harrison Bros. & Co. of their contract with the Insulated Lines Telegraph Company, that firm was given the privilege of putting up, at its own expense, a wire on the poles of the telegraph company, between Philadelphia and New York, to be used as well by them in their legitimate mercantile and personal business, as by their licensees, not exceeding four in number — such licensees not being telegraph or railroad companies, bankers or stock or exchange brokers. And in consideration of the company being allowed to use the wire, when not in use by Harrison Bros. & Co. or their licensees, the company agreed to keep and maintain it in good working order at its expense. The contract next provided that, upon the expiration of ten years, the wire should become the property of the telegraph com-

pany. Then follows the agreement of the telegraph company to lease it for $600 per annum, payable quarterly, to be used by Harrison Bros. & Co. and their licensees, "upon the same terms in all other respects, as if the wire had not been given up" to the telegraph company. Now, this means that, whereas, before the expiration of ten years, the wire should belong to Harrison Bros. & Co. and be used by them and their licensees, free of charge or expense for legitimate messages, it should, after ten years, belong to the telegraph company, but subject to be used in the same way as before by paying $600 dollars annually; the right, however, remaining with the telegraph company to use it when not in use by Harrison Bros. & Co. and their licensees. The requirement that its use by Harrison Bros. & Co. after ten years should be " upon the same terms *in all other respects as if the wire had not been given up*," can only be met by according to appellees and their licensees the same absolute right of use they enjoyed before the wire was given up to the company, subject to the condition that, instead of having their messages transmitted without charge, they must pay $600 per annum. This, we think, is the reasonable interpretation of the contract. And that view is supported to some extent by the fact that the parties deemed it necessary to provide that no assignment by Harrison Bros. & Co. of their right under the contract should give their assignees the right to demand a lease of the wire after the expiration of the ten years. That clause was wholly unnecessary if it was intended to give Harrison Bros. & Co. merely the rights of a tenant from year to year; for, if only that relation was established by the contract, the telegraph company could have determined it at any time, upon due notice. After the expiration of ten years, Harrison Bros. & Co. had only a priority in the use of the wire in consideration of a fixed annual sum to be paid quarterly. They retained neither control nor possession nor interest in the property. They simply purchased the use, without limitation as to time, after the ten years, for themselves and licensees, of a wire erected on the poles of the telegraph company, between Philadelphia and New York.

We do not find in all this the essential characteristics of a lease.

Why shall not the telegraph company perform the terms of its contract? Its original execution was unattended by fraud, surprise, misrepresentation, imposition, concealment of material facts or mistake. The parties thoroughly understood the situation and knew what they were doing. The possibility that, by reason of an increase in the population and business of New York and Philadelphia, the use of a telegraphic wire between those cities could, in time, be sold for more than $600 per annum was, of course, present to the minds of those who were interested in the telegraph company, and to whom were entrusted the negotiations for the relinquishment of the contract Harrison Bros. & Co. had with the Insulated Lines Telegraph Company. Nevertheless, the telegraph company deliberately chose to risk that possibility in order to get the Harrison contract out of its way. That contract having been relinquished, and a large sum, exceeding $10,000, having been advanced by Harrison Bros. & Co. to erect the wire, the telegraph company ought not to be heard to urge, as a ground for not performing its agreement, that the annual license fee stipulated to be paid by appellees is much less than could be now obtained from others. If competing telegraph lines had been established between New York and Philadelphia, and by reason thereof such use as appellees and their licensees make of the wire in question could now be had for much less than $600 per annum, that circumstance would hardly constitute sufficient ground for them to refuse payment of the full amount stipulated to be paid for its use annually. A different rule should not be applied where the price has increased, because of the absence of competition among telegraph companies, or from other causes not attributable to the plaintiffs.

It is said that the contract turns out to be a hard one for the telegraph company, and that a court of equity should not aid in its enforcement. It is true that in many adjudged cases, and by numerous text-writers, the general rule is laid down that equity in the exercise of a sound judicial discretion

will refuse a decree for specific performance where it would be a great hardship upon one of the parties to grant relief of that character. But this general rule is subject, in its application, to some limitations that arise out of the facts of particular cases.

In *Cathcart* v. *Robinson*, 5 Pet. 264, 271 — which was a suit to enforce the specific performance of a contract for the sale and purchase of land, in which one of the defences was the excessive price for which the land was sold — Chief Justice Marshall, while conceding that excess of price was an ingredient which, associated with others, will contribute to prevent the interference of a court of equity, said: " The value of real property had fallen. Its future fluctuation was matter of speculation. At any rate, this excess of price over value, if the contract be free from imposition, is not in itself sufficient to prevent a decree for a specific performance."

In *Marble Company* v. *Ripley*, 10 Wall. 339, 356, where the decree required the specific performance of a contract to quarry marble, and was objected to upon the ground that, though supposed to be fair and equal when made, the contract became, by lapse of time, and the operation of unforeseen causes, and changed circumstances, unfair, unreasonable and unconscionable, the court, speaking by Mr. Justice Strong, said: " It may be doubted, however, whether the hardship of the contract is any greater than must have been contemplated when it was made. It is not unconscionable because Ripley obtains a larger profit from it than was at first expected, or because the other party obtains less. Those were contingencies, the possibility of which might have been foreseen. It could not have escaped the thought of the contracting parties that the expense of quarrying might possibly increase, and that the expense of sawing and preparing for market might either increase or diminish in the progress of time. Of that they took their chances. Besides, it is by no means clear that a court of equity will refuse to decree the specific performance of a contract, fair when it was made, but which has become a hard one by the force of subsequent circumstances or changing events." These principles, the court said, must be appli-

cable to contracts "that do not look to completed performance within a defined or reasonable time, but contemplate a continuous performance, extending through an indefinite number of years, or perpetually." Fry on Specific Performance, 116, and c. 6.

In Sugden on Vendors it is said that "a court of equity does not affect to weigh the actual value, nor to insist upon an equivalent in contracts, where each party has equal competence. When undue advantage is taken, it will not enforce the contract; but it cannot listen to one party saying that another man would give him more money or better terms than he agreed to take. It may be an improvident contract; but improvidence or inadequacy do not determine a court of equity against decreeing specific performance." c. 5, § 3, par. 25; *Sullivan* v. *Jacob*, 1 Molloy, 472, 477. So, in *Lee* v. *Kirby*, 104 Mass. 420, 428 : "The question of the want of equality and fairness, and of the hardship of the contract, should, as a general rule, be judged of in relation to the time of the contract, and not by subsequent events. We do not intend to say that the court will never pay any attention to hardships produced by a change of circumstances; but certainly the general rule is, that a mere decline in value since the date of the contract is not to be regarded by the court in cases of this nature." See also *Revell* v. *Hussey*, 2 Ball & Beatty, 280, 287; *Paine* v. *Mellor*, 6 Ves. 349, 352; *Mortimer* v. *Capper*, 1 Bro. Ch. 156.

In view of these principles, which we think are founded in wisdom, we are of opinion that the fact that the appellants could, at the commencement of this suit, or since, sell at an increased price the privilege for which the appellees paid by relinquishing a valuable contract and advancing a large sum of money, and which privilege they now enjoy for the stipulated price of $600 per annum, is not sufficient to justify the court in withholding the relief asked.

It was said in argument, as a reason why the relief sought should not be granted, that the appellees and their licensees had now the exclusive use of the wire in question; whereas, the expectation of the parties, at the time of the contract, was

that the telegraph company would have the use of it during, at least, a part of the time. It is sufficient to say that this fact is not established by the evidence. It is true that an officer of the Atlantic and Pacific Telegraph Company, in a letter addressed to Harrison Bros. & Co., stated that his company was furnishing to that firm "the exclusive use of a wire between New York and Philadelphia, maintaining and supplying battery for it for the sum of $600 per annum." But no such fact was stated by any witness in the cause. It is still more significant that the answer contains no such defence. What would be the rights of the parties if the appellees so used the wire in question as to deprive the telegraph company of all opportunity to use it for its general business, or whether, in such a case, the court would or would not refuse specific performance, except upon the condition that the telegraph companies shared in the use of the wire for a reasonable portion of the time, *Willard* v. *Tayloe*, 8 Wall. 557, we need not inquire. No such case is presented for our consideration.

In respect to the question discussed at the bar, relating to the remedy, but little need be said. It is clear that the appellees had no adequate remedy at law for the protection of their rights. Suits at law, from time to time, to recover damages for the refusal of the telegraph company to transmit the messages of appellees over this wire, would not have given the relief necessary to secure their rights under the contract. Such a remedy would not be complete, nor an adequate substitute for an injunction that would secure the appellees against perpetually recurring denials of their rights. *Joy* v. *St. Louis*, 138 U. S. 1, 46.; *Coosaw Mining Co.* v. *South Carolina*, 144 U. S. 550, 567. If appellees are entitled, for the sum of $600 per year, payable quarterly, to have the messages of themselves and their licensees transmitted over the appellants' wire between New York and Philadelphia, so long as the latter maintain a telegraph line between those cities — as we think they are — the only effective relief is a decree such as that rendered below.

*Decree affirmed.*

MR. CHIEF JUSTICE FULLER, with whom concurred MR. JUSTICE BREWER, dissenting.

I cannot assent to the conclusion reached by the court. In my judgment, the interest of appellees under the contract, after the expiration of ten years from its date, was in the nature of a lease, the word "lease" being advisedly used in the agreement. And as while the length of time was not expressed, it was provided that the wire should be leased "for the sum of six hundred dollars per annum, payable quarterly," the implication is that it was a right to use from year to year.

The accepted rules of construction forbid the view that the contract was of indefinite duration; and if such had been the intention, it should have been expressed.

Moreover, this is not a case for specific performance. The construction contended for by appellees is at the best doubtful, and as the record sufficiently discloses that the contract thus construed has a harsh and unconscionable operation, not reasonably within the contemplation of the parties when they entered into it, the court was not bound, by way of grace and not of right, to compel its execution.

My brother Brewer concurs with me in this dissent.