## GAULEY MOUNTAIN COAL CO. v. COMMISSIONER OF INTERNAL REVENUE.

Circuit Court of Appeals, Fourth Circuit.
January 13, 1928.

No. 2635.

1. **Internal revenue** ⊚⇒7(10), 9(27)—**"Invested capital," exempt from income and profits tax, involves expenditure and acquisition of something of permanent value in business (Revenue Act 1918, § 326 [Comp. St. § 6336⅛i]).**

Mere increase in value of property of taxpayer, not representing money or property actually invested, cannot be treated as "invested capital," exempt from income and profits tax under Revenue Act 1918, § 326 (Comp. St. § 6336⅛i); but, to constitute invested capital, there must be a laying out of money, or money's worth, and the acquirement of something of permanent use or value in the business.

2. **Internal revenue** ⊚⇒7(10), 9(27)—**Reduction in price of coal to railroad for railroad's construction of branch line held "invested capital" of coal company, within statute (Revenue Act 1918, § 326 [Comp. St. § 6336⅛i]).**

Payment made by coal company to railroad, through reduction in price of coal furnished railroad under contract to furnish 100,000 tons of coal per year for 10 years at 25 cents per ton less than the market price, in consideration of railroad's agreement to build a branch line to its coal lands, *held* to constitute "invested capital" for purposes of computing income and excess profit taxes, within Revenue Act 1918, § 326 (Comp. St. § 6336⅛i), notwithstanding branch line was railroad's property, and no time was specified during which railroad was required to furnish transportation facilities, since railroad connection was acquired through corporation's business activities, and constituted something of permanent value to coal company's business.

Northcott, Circuit Judge, dissenting.

On Petition to Review the Decision of the United States Board of Tax Appeals.

Petition by the Gauley Mountain Coal Company against the Commissioner of Internal Revenue to review a decision of the United States Board of Tax Appeals, refusing to exempt certain expenditures as invested capital. Decision of the Board of Tax Appeals reversed, and case remanded.

This is a petition to review a decision of the United States Board of Tax Appeals. The Commissioner of Internal Revenue determined against the Gauley Mountain Coal Company a deficiency in income and profits tax for the year 1920, amounting to $55,245.-43. Of this amount the taxpayer admitted $46,042.57, but contested payment of the remainder. The question involved is whether the taxpayer is entitled to treat as invested capital the amount paid by it through reduction in price of coal for the construction on its property of a branch line of railroad giving it railroad connection with the main line of the Chesapeake & Ohio Railway Company. The amount claimed to have been thus paid is $250,000. If this be treated as invested capital, the taxpayer, through amortization and reduction in rate resulting, is entitled to the deduction claimed. The facts as stipulated by the parties and found by the Board of Tax Appeals are as follows:

"Findings of Fact. ·

"The petitioner is a West Virginia corporation, with its principal place of business at Ansted. It was organized about 1889 and is engaged in the operation of a coal mine in Fayette county, West Virginia.

"Prior to the organization of the petitioner, several attempts had been made by its predecessors in interest to operate the mine here involved; but all such efforts had resulted in failure, due to the lack of transportation facilities for the mined coal.

"On October 24, 1889, the Chesapeake & Ohio Railway Company, as party of the first part, and the petitioner, as party of the second part, entered into an agreement, the material parts of which are as follows:

"'(1) The said party of the second part being the assignee of William N. Page, of Fayette county, West Virginia, of a lease taken by the said Page from J. M. Payne, Thomas D. Ranson, and George Couch, commissioners, of certain property near Ansted, Fayette county, West Virginia, known as the property of the Hawk's Nest Coal Company, Limited, hereby agrees to supply the said railway company with the run of mine coal from the said mines at the rate of 60 cents per ton of 2,240 pounds, free on board cars at the mines to the extent of the full capacity of the mines, if required by the said railway company, except as hereinafter provided.

"'(2) The said party of the first part agrees to guarantee orders and transportation for not less than 100,000 tons of the said coal per annum for the period of 10 years, provided the said coal shall be suitable for railroad use, which in case of dispute is to be determined by arbitration as hereinafter provided.

"'(3) Nothing in the agreement shall be held to restrain the said coal company from supplying coal to parties other than the Chesapeake & Ohio Railway Company, so long as the quantity thus supplied shall not interfere with the furnishing of 100,000 tons

per annum to the said railway company as above provided.

" '(4) The said railway company agrees to begin to construct before the 1st day of December, A. D. 1889, and to complete with all possible diligence, a line of standard gauge railway from the main line of the Chesapeake & Ohio Railway at Hawk's Nest, West Virginia, to the said mines, and to maintain and operate the said road without any charge or freight rate additional to the regular New River charges on coal and coke, and when the said road is completed to supply to the said coal company its due proportion of cars for the prompt delivery of its product without delay, except such as may be caused by unavoidable accidents. The said railway company also agrees that the rates on coal to any iron or steel works shall at all times be reasonable and equitable as compared with the rates on coal or coke from other points, and that the said party of the second part shall be entitled to and accorded as favorable rates and facilities as may be enjoyed by or accorded to any agency, individual or corporation engaged in the coal business in the New River section of the railroad.

" '(5) It is further agreed that in case the selling price of the New River coals as a section shall fall below and be furnished at less than 85 cents per gross ton free on board cars, then the said coal company is to reduce the price pro rata to the railway company; but in no event shall any reduction be made which will bring down the net profit on the said coal to less than 20 cents per ton, and, if there be any dispute as to what the net profit is, the question shall be submitted to arbitration in the manner hereinafter provided. And in the event that the selling price of coals from the New River section should exceed $1 per ton, the said coal company shall be paid by the said railway company a corresponding pro rata additional allowance upon the rate of 60 cents per ton hereinbefore specified.

" '(6) The said railway company agrees to pay for the coal sold to or through it by the said coal company in cash on or before the 20th day of the month succeeding the month in which the deliveries are made.

*    *    *    *    *    *

" '(8) The said party of the first part guarantees in the event of its failure to take or sell the total product of the mine or mines that the said party of the second part may sell or dispose of the same upon the same footing with any agency established or controlled by the said railway company or any other individual to whom cars or facilities shall be furnished, and shall be allowed the same commission per ton towards the expense of selling as is paid to the New York coal agency of this company, if it shall then have any and so long as it shall continue, in addition to the selling price upon all sales so effected by the coal company independently of the railway company and its agency.'

"The price of 60 cents per ton, specified in the above contract, was 25 cents less than the then prevailing market price, and has at all times since been at least 25 cents less than the prevailing market price.

"The Chesapeake & Ohio Railway Company commenced the construction of the branch line, which was about 4 miles in length, in 1889, and completed it in 1890, at a cost of approximately $100,000. The full length of this branch line traverses the property of the petitioner. The petitioner has not paid taxes upon this branch line, which has always been, and still is, managed, maintained, and operated by the railway company.

"During the 10-year period in which the agreement between the two companies was effective, the petitioner supplied the railway company with at least 100,000 tons of coal each year, at 25 cents per ton under the prevailing market price."

Upon these facts, the Board of Tax Appeals, over the dissent of one of its members, decided the issue presented against the taxpayer, and this court is petitioned to review the decision.

R. T. Hubard, of Fayetteville, W. Va. (Hubard & Bacon, of Fayetteville, W. Va., on the brief), for petitioner.

Maxwell E. McDowell, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C. (Mabel Walker Willebrandt, Asst. Atty. Gen., Harvey R. Gamble, Sp. Asst. Atty. Gen., and A. W. Gregg, Gen. Counsel, Bureau of Internal Revenue, of Washington, D. C., on the brief), for respondent.

Before WADDILL, PARKER, and NORTHCOTT, Circuit Judges.

PARKER, Circuit Judge (after stating the facts as above). In 1889 the taxpayer was the owner of coal lands in West Virginia, which it was unable to operate successfully because of lack of railway connections. In that year it entered into a contract with the Chesapeake & Ohio Railway Company to build a branch line to its property, and in consideration thereof agreed to furnish the railway company 100,000 tons of coal a year

for 10 years at 25 cents per ton less than the market price. The line was built and the coal was furnished according to contract. The railway was furnished a quantity of coal through a 10-year period for a price $250,000 less than the taxpayer could have obtained for it on the market, and the taxpayer has received in return for the reduction a railroad connection which has enabled it to operate its property and added greatly to the value thereof. The question involved here is whether the taxpayer is entitled to treat this $250,000 which it paid to the railroad company through reduction in the price of coal as capital invested in its property. If so, it is entitled to the reduction in tax which it claims.

The decision of the Board of Tax Appeals disallowing the claim of the taxpayer seems to be based on the idea that, in consideration of the delivery of coal at less than market price, it obtained a service and not a capital asset, that it invested nothing in its property and that any gain which accrued to it was a mere increase in the value of property which could not be included in invested capital. We think that the board erred in its conclusion that the taxpayer did not invest anything in the construction of the branch line and in treating as a mere service the railroad facilities and connection acquired. It seems clear to us that for this connection the taxpayer paid value in the coal which it delivered at less than market price, and that in acquiring the connection the taxpayer not only increased the value of its property, but also acquired something which was and is of continuing value to it in the operation of its mines. If we are correct in this, there can be no doubt that the amount paid for the railroad connection must be treated as invested capital within the meaning of the taxing statute.

[1] We lay to one side any suggestion that mere increase in the value of the property of the taxpayer, not representing money or property actually invested, can be treated as invested capital within the purview of the act. It is perfectly clear that such "unearned increment" is not invested capital. La Belle Iron Works v. U. S., 256 U. S. 377, 41 S. Ct. 528, 65 L. Ed. 998. As said in the case cited:

"The word 'invested' in itself imports a restrictive qualification. When speaking of the capital of a business corporation or partnership, such as the act deals with, 'to invest' imports a laying out of money, or money's worth, either by an individual in acquiring an interest in the concern with a view to obtaining income or profit from the conduct of its business, or by the concern itself in acquiring something of permanent use in the business; in either case involving a conversion of wealth from one form into another suitable for employment in the making of the hoped-for gains. * * * It is clear enough that Congress adopted the basis of 'invested capital' measured according to actual contributions made for stock or shares and actual accessions in the way of surplus, valuing them according to actual and bona fide transactions and by valuations obtaining at the time of acquisition, not only in order to confine the capital, the income from which was to be in part exempted from the burden of the special tax, to something approximately representative of the risks accepted by the investors in embarking their means in the enterprise, but also in order to adopt tests that would enable returns to be more easily checked by examination of records. * * * *"

In the light of this language of the Supreme Court, we think it is clear that, to constitute invested capital, there must have been (1) a laying out of money or money's worth, and (2) the acquirement of something of permanent use or value in the business. The questions in this case, therefore, are: Was the furnishing of coal under the contract at less than market price the laying out of money or money's worth? and was the railroad connection acquired thereby a thing of permanent use or value in the business of the taxpayer? We think that both of these questions must be answered in the affirmative.

[2] On the first question, the finding is that the coal was furnished at 25 cents per ton less than the market price. We must assume that it was salable at the market price, and it follows that, because of the contract under which the railroad facilities were acquired, the taxpayer received, in payment of the coal furnished thereunder, 25 cents per ton less than could have been obtained therefor. So far as both parties to the contract were concerned, the result was not different from what it would have been if the taxpayer had sold the coal at the market price and paid the railroad company $25,000 per year for the 10-year period. If the taxpayer had done this, instead of what it did do, no one would have questioned that it would have been proper to treat the amount paid as invested capital. Likewise there would have been no question if the taxpayer had furnished to the railroad company $25,000 worth of coal a year for 10 years in payment

for the connection; and we see no difference between furnishing $25,000 worth of coal without charge and furnishing $85,000 worth for $60,000. Things which are equal to the same thing are equal to each other.

It is argued that the 25-cent reduction under the market price was not in reality given for the construction of the branch line and the furnishing of railroad facilities to the taxpayer, but because the railroad company purchased so large a quantity of coal under its contract. But there is no finding, and so far as the record shows no basis for finding, that the market price referred to in the findings of the board was not the market price governing in the sale and purchase of large quantities of coal under contract such as the purchases by the railroad, nor that the sale of the coal at less than the market price was based on any other consideration than the construction of the branch line and the furnishing of railroad facilities incident thereto. Furthermore, there is no suggestion in the record that, after the taxpayer had discharged its obligation under the contract, it furnished any additional coal at less than the market price, and nothing to justify the inference that the 25-cent reduction was not given solely in consideration of the furnishing of the railroad connection.

It is said that until the branch line was built the coal was not worth the prevailing market price, because it was 4 miles off of the railroad, and that what the railroad agreed to pay for it was probably all that it was worth, and from this it is argued that the taxpayer in reality paid nothing for the railroad connection. Passing by the fact that even under this argument the acquisition of the railroad connection was in a very real sense a profit realized on the contract, which was not divided among the stockholders, but retained as an asset of the business, we think that the argument ignores the fact that the coal was not delivered and title thereto did not pass until after the railroad connection was furnished. It was then unquestionably worth the prevailing market price, and, when the taxpayer delivered it under the contract, the result, as shown above, was in no wise different from what it would have been if the coal had been sold at the market price and $25,000 per year paid to the railroad.

Some confusion in thinking results from the fact that the coal was delivered to the same corporation which furnished the railroad connection, and that that corporation in effect paid itself for the connection from the price of the coal. If the branch line had been constructed under a contract providing that the coal should be furnished to a third person, and that the railroad company should be paid $25,000 a year from the proceeds, there would be no doubt about the amount so paid being a capital investment. This is precisely what was done, except that the coal was delivered to the railroad company itself, instead of to a third person, and the consideration, instead of being paid by the third person, was deducted by the railroad itself from the market price of the coal in paying for same.

Coming to the second question, we do not think that what was acquired by the amount paid through the reduction in the price of coal which we have discussed was a mere transitory service, nor a mere intangible increase in the value of property, such as that resulting from the discovery of mineral deposits as in the La Belle Iron Works Case, but was a right of permanent value to the Company operating the mining property, and one which added greatly to the value of the property itself. Before the branch line was built, the mines of the taxpayer were 4 miles away from a line of railroad, and for that reason could not be operated profitably. As a result of its construction, and the railroad connection thereby acquired, the facilities of a great railway system have been brought to the mines of the company, and this has done away with the necessity of transporting the coal to the line of the railroad.

The taxpayer has acquired property of permanent value in the same sense as does a manufacturing corporation which pays a railroad company to build an industrial siding to its plant, or a land development company which pays a bonus to a street railway company to build a line through its property. Whether the rights acquired as a result of the railroad connection obtained are to be defined as tangible or intangible property, it is not necessary to inquire. Intangible property, which enables a taxpayer to save or earn money, is as legitimate a form of capital investment as tangible property. Thus money spent in building up the circulation of a newspaper has been held to be capital invested, within the meaning of the taxing acts. Appeal of Gardner Printing Co., 4 B. T. A. 37; In re M. Co. and O. Co., A. R. M. 141; C. B. Dec. 1921, p. 296. The railroad connection itself is quite tangible, the rights flowing therefrom are intangible; but, whether tangible or intangible, the connection and the rights incident thereto are of great value to the taxpayer, and save it many thousands of dollars annually in marketing its coal.

Because, in the absence of the railroad connection, it would be necessary for the taxpayer to transport its coal to the line of the railroad, it is argued that what it really obtained for the payment to the railroad was service in the transportation of coal. . But the mere fact that the payment to the railroad obviated the necessity of making expenditures for service does not mean that such payment was itself an expenditure for service. What the taxpayer obtained was the railroad connection, and, although the railroad transports coal over the branch line, this is a mere incident of the connection. When a manufacturing company pays a railroad company to install for it an industrial siding, it dispenses with the laborers and teams theretofore used to transport its products to the railroad station, and some service is performed by the railroad company in placing cars on the siding; but no one would contend that the amount paid the railroad to install the siding is for service rendered, or that it is not properly treated as a capital investment. We see no difference in principle between such a case and the case at bar.

It is said that, because the track of the branch line is the property of the railroad, and no time is specified by the contract during which the railroad shall continue furnishing service over same, the taxpayer has received no property, tangible or intangible, for the expenditure it has made. But the important thing to the taxpayer is, not the ownership of the track, but the fact that by means of it is furnished the railroad connection desired. In the case of industrial sidings, just adverted to, the track is generally the property of the railroad.

Nor is it important, we think, that the contract specifies no time during which the connection and the service incident thereto shall be maintained. As a practical matter, now that the branch line has been built, the connection will be maintained and the service furnished without reference to the contract. The railroad is in the business of hauling coal, and may be relied upon from motives of self-interest to continue to haul the coal from taxpayer's mines so long as it is profitable to do so. The contract, although not prescribing a period during which service over the branch line shall be maintained, does not provide that the railroad may discontinue it; and, if its discontinuance should be attempted, some very interesting questions would arise which it is not necessary to pass upon here. See Franklin Tele. Co. v. Harrison, 145 U. S. 459, 12 S. Ct. 900, 36 L. Ed. 776; McKell v. Chesapeake & O. R. Co. (C.

C. A. 6th) 186 F. 39, 45; State of West Virginia ex rel. Mt. Hope Coal Co. v. White Oak R. Co., 65 W. Va. 15, 64 S. E. 630, 28 L. R. A. (N. S.) 1013, and note.

It is clear that, although the track does not belong to the taxpayer, and the contract does not provide a specific period during which the service over it shall be continued, nevertheless the laying of the track and the railroad connection resulting therefrom established for the taxpayer a relationship with the railroad of mutual advantage and of great and continuing value to the taxpayer.

Finally, it is contended that, even though there may have been an investment, and even though the right acquired or the relationship established may be a thing of value, there has not been an investment of capital within the terms of section 326 of the Revenue Act of 1918 (Comp. St. § 6336⅛i). The part of that section which is applicable provides:

"(a) That as used in this title the term 'invested capital' for any year means * * * (3) paid-in or earned surplus and undivided profits. * * *"

In commenting upon the meaning of this language the Supreme Court, in the La Belle Iron Works Case, supra, said:

"In order to adhere to this restricted meaning and avoid exaggerated valuations, the draftsman of the act resorted to the test of including nothing but money, or money's worth, actually contributed or converted in exchange for shares of the capital stock, *or actually acquired through the business activities of the corporation or partnership (involving again a conversion) and coming in ab extra, by way of increase over the original capital stock.*" (Italics ours.)

There can be no doubt that the coal delivered to the railroad by the taxpayer, the payment made through the sale of the coal at less than market price, and the valuable railroad connection acquired thereby were "acquired through the business activities of the corporation," and came in "ab extra by way of increase over the original capital stock." The corporation has acquired valuable railroad facilities. It has done so by delivering its coal to the railroad at less than what it was worth, to pay for these facilities. A part of the value of the coal which prior to delivery was the property of the corporation has thus been "converted" into the facilities, and a part of the profits of the corporation are tied up therein. Why these facilities do not represent surplus or undivided profits of the corporation, and thus come

squarely within the terms of the act, we are unable to see.

We should say in conclusion that this does not seem to be a case where the taxpayer is seeking to build up a fictitious showing of invested capital out of "chips and whetstones." The contract relied on is in writing. There is no dispute about the shipments of coal. The price obtained for it and the market price prevailing are admitted. All are matters capable of being ascertained from the records of the corporation. In such a situation, we see no reason why the taxpayer should not be allowed to include in invested capital the amount which it has paid through deliveries of coal at less than market price to obtain railroad facilities which are of value in themselves, which have added greatly to the property of the taxpayer, and which have made it possible for the taxpayer to realize the income upon which the tax is assessed.

For the reasons stated, the decision of the Board of Tax Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

Reversed.

NORTHCOTT, Circuit Judge (dissenting). I cannot concur in the foregoing opinion for the reason that it appears clear to me that no part of the consideration passing from the coal company in its contract with the railroad in this case can in any way be considered as invested capital under the provisions of the act of Congress (section 326 of the Revenue Act of 1918). That part of the section which is applicable provides:

"(a) That as used in this title the term 'invested capital' for any year means * * * (3) paid-in or earned surplus and undivided profits. * * *"

The $250,000 claimed by the company to have been invested, never passed through the hands of the company, was never credited to surplus or undivided profits, and was only a vague and indefinite benefit surrendered by the company in the price of its coal as sold to the railroad company. Under the reasoning of the La Belle Iron Works Case, 256 U. S. 377, 41 S. Ct. 528, 65 L. Ed. 998, to receive the benefits of an invested capital expenditure, the investment must appear clearly and conclusively, and must not be the result of surmise or "hoped-for gains."

Under its contract with the railroad, the coal company acquired no asset, either tangible or intangible, other than the right to use the spur track, in which right the coal company participated along with the general public, under the laws governing common carriers.

The railroad company could, with much more reason, charge the cost of constructing the track in question to its capital account, and to allow the Gauley Mountain Coal Company to do likewise would be permitting a double charge to capital account, and result in an injustice to the government.

It does not appear from the record just how much of the consideration for the contract entered into between the Gauley Mountain Coal Company and the railroad company consisted of the fact that the coal company was securing a sale for a large and fixed quantity of coal to a customer of the highest credit rating, with assurance of prompt payment, a consideration which frequently leads companies to cut the price of their product.

Congress could have provided that such a transaction as the one here set out could be charged up to invested capital, but in its wisdom it has not seen fit to do so, and, in order to secure this privilege, the Gauley Mountain Coal Company must bring itself squarely within the provisions of the act of Congress. This it has not done.