## KLEESON CO. v. BLAIR, Commissioner of Internal Revenue.

Circuit Court of Appeals, Fourth Circuit. October 16, 1928.

No. 2711.

Robert H. McNeill, of Washington, D. C. (James A. Councilor, of Washington, D. C., on the brief), for petitioner.

John Vaughan Groner, Special Asst. Atty. Gen., of Norfolk, Va. (Mabel Walker Willebrandt, Asst. Atty. Gen., Sewall Key, Sp. Asst. Atty. Gen., and C. M. Charest, General Counsel Bureau of Internal Revenue, and V. J. Heffernan, Sp. Atty. Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before PARKER and NORTHCOTT, Circuit Judges, and SOPER, District Judge.

SOPER, District Judge. This case is before the court on petition for review of a decision of the United States Board of Tax Appeals, filed pursuant to the Revenue Act of 1926, 44 Stat. 109, 110 (26 USCA § 1224). Income and profit taxes for the years 1920, 1921, and 1922, assessed under the Revenue Act of 1918 (40 Stat. 1057), in the respective sums of $21,874.38, $4,800.13, and $14,050.51, are involved. The taxpayer complains that the Board erred in refusing to allow, as part of its invested capital, the fair value of a contract acquired by it in 1919 at or about the time of its organization as a corporation,

The record shows that in 1916 the state board of control of West Virginia, which had charge of the penal institutions in that state, gave to Joseph Klee's Sons Company a five-year contract for the hire of convict labor to be employed within the walls of the State Penitentiary at Moundsville. In 1919, the corporation retired from business and assigned the contract to one John A. Bloyd, with the assent of the state board. Bloyd paid $10,000, for the machinery and equipment of the corporation, and invoice price for the merchandise on hand. To give effect to the new arrangement, the state board issued a new 5-year contract on substantially the same terms to Bloyd and one M. Bachenheimer, who had been the manager of the factory. Bloyd and Bachenheimer discovered that their available capital was insufficient to meet the demands of the contract. The Kleeson Company, a new corporation, the taxpayer in this case, was therefore formed for the purpose of raising the necessary money and carrying out the obligations of the contract. Capital stock to the amount of $200,000 was issued in exchange for cash, of which Bloyd and Bachenheimer furnished a little less than one-half, and other stockholders supplied the remainder. Bloyd and Bachenheimer then assigned the contract to the new company. This assignment was also recognized by the state board, which shortly thereafter substituted a new contract, executed by it and the new corporation.

Neither Bloyd nor Bachenheimer made any payment to the Joseph Klee's Sons Company for the assignment of the first-named contract, nor did the Kleeson Company make any payment to Bloyd and Bachenheimer for the assignment of the contract to it. It merely accepted the contract and agreed to assume the obligations therein imposed upon the original contractors. Nevertheless it contended in its petition for appeal, filed with the Board of Tax Appeals, that the contract which it had thus acquired had a value in excess of $450,000. The estimates of its value given in the evidence, and by appellant's counsel in their analysis, range from $150,000 to $607,400. The Board of Tax Appeals, over the dissent of two of its members, found that the contract had no fair market value as of the date of its assignment, and that in any event its value should be properly excluded from invested capital, as a matter of law.

The Commissioner of Internal Revenue contends that this court has no power to review this finding, so far as it is one of fact, on the ground that it was the intention of Congress to create an independent Board of Tax Appeals with power to determine finally all questions of fact between the government and the taxpayer, leaving only matters of law for review by the Circuit Courts of Appeal. Avery v. Commissioner (C. C. A.) 22 F.(2d) 6, 55 A. L. R. 1277; Royal Packing Co. v. Commissioner (C. C. A.) 22 F.(2d) 536; Blair v. Curran (C. C. A.) 24 F.(2d) 390; Henderson Iron Works v. Blair, 25 F.(2d) 538, decided by the Court of Appeals of the District of Columbia April 2, 1928. A decision on this point is, however, not necessary in this case, because we think that the conclusions of fact of the Board of Tax Appeals were correctly made.

The taxpayer contends that its contract was of value because of the profits which were made, not only by Joseph Klee's Sons Company prior to 1919, but also by the Kleeson Company since that date. Bloyd's testimony tends to show that the first corporation made large sums of money during the 25 years in which they had control of the prison labor, under contract with the state, and that, when they retired from business, they regarded their current contract, which had then approximately 2 years to run, as having a value of $100,000. He also testified that he was thoroughly familiar with the business done at the penitentiary, since he had been one of the managing directors of the institution from 1897 to 1913; that he had been in the confidence of the contractors during that period, had closely observed their operations, and from time to time had befriended them. It also appears that Bloyd was a capable business man of large and varied interests in the community. When he organized the second corporation, he invited other investors to purchase stock, representing to them that the contract was worth at a minimum $150,000, and thereby secured their co-operation. The contract was entered upon the books of the company at a valuation of $150,000, and credited to surplus.

Other circumstances are cited to show the value of the contract. The cost of manufacturing with free labor was estimated to be twice the cost of manufacturing with prison labor. The contract provided for the employment of 200 convicts at 300 days per year at 95.5 cents per day, whereas the minimum cost per day of outside labor was shown to be $2. It was also estimated that the use, without charge, of the factory buildings inside the penitentiary walls, conferred a privilege upon the contractor comparable to a rental value of $30,000 per year. It was also shown that in 1923 a similar contract in West

Virginia, which had some 4 years to run, was sold for the sum of $150,000.

This evidence would be of material weight if it were necessary or proper to form an estimated value of the contract at the time of its grant. We are, however, restricted in the determination of value by the definition of "invested capital" found in section 326a of the Revenue Act of 1918, chapter 18, 40 Stat. 1057, 1091. That part of the section which is applicable is as follows:

"Sec. 326 (a) That as used in this title the term 'invested capital' for any year means * * *

"(1) Actual cash bona fide paid in for stock or shares.

"(2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case such excess shall be treated as paid-in surplus. * * *

"(3) Paid-in or earned surplus and undivided profits. * * *

"(5) Intangible property bona fide paid in for stock or shares on or after March 3, 1917, in an amount not exceeding (a) the actual cash value of such property at the time paid in, (b) the par value of the stock or shares issued therefor, or (c) in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding at the beginning of the taxable year, whichever is lowest. * * * "

We considered this section in Gauley Mountain Coal Co. v. Commissioner of Internal Revenue (C. C. A.) 23 F.(2d) 574, in the light of the discussion of the analogous section 207 of the Revenue Act of 1917, 40 Stat. 306, by the Supreme Court in La Belle Iron Works v. United States, 256 U. S. 377, 41 S. Ct. 528, 65 L. Ed. 998. Mr. Justice Pitney showed very clearly in that case that it was the purpose of Congress to fix actual costs rather than higher estimates as the basis for the determination of invested capital. Thus it was enacted that invested capital should include (1) actual cash bona fide paid in for stock; (2) actual cash value of tangible property bona fide paid in for stock at the time of such payment, but in no case to exceed the par value of the stock issued therefor, unless the actual cash value of the property is substantially in excess of the par

value, in which case such excess shall be treated as paid-in surplus; (3) paid-in or earned surplus. Since no stock was issued for the Bloyd-Bachenheimer contract, it may be included as invested capital only if it comes within the description of paid-in surplus. It is obvious that the term "surplus" is to be given the same meaning whether it consists of tangible property, paid in to the corporation in connection with an issuance of stock or paid in independently of the issuance of stock. In either case only the actual cash value of the surplus at the time that it is paid in may be used in computing the invested capital. Actual cash value can have no other meaning than the amount of the proceeds of the property when reduced to cash in a bona fide transaction.

The Supreme Court said in the cited case, page 387 of 256 U. S. (41 S. Ct. 530):

"If such capital were to be computed according to appreciated market values based upon the estimates of interested parties * * * exaggerations would be at a premium, corrections difficult, and the tax easily evaded. Section 207 shows that Congress was fully alive to this and designedly adopted a term 'invested capital' and a definition of it, that would measurably guard against inflated valuations. The word 'invested' in itself imports a restrictive qualification. When speaking of the capital of a business corporation or partnership, such as the act deals with, 'to invest' imports a laying out of money, or money's worth, either by an individual in acquiring an interest in the concern with a view to obtaining income or profit from the conduct of its business, or by the concern itself in acquiring something of permanent use in the business; in either case involving a conversion of wealth from one form into another suitable for employment in the making of the hoped-for gains. * * *

"It is clear enough that Congress adopted the basis of 'invested capital' measured according to actual contributions made for stock or shares and actual accessions in the way of surplus, valuing them according to actual and bona fide transactions and by valuations obtaining at the time of acquisition, not only in order to confine the capital, the income from which was to be in part exempted from the burden of this special tax, to something approximately representative of the risks accepted by the investors in embarking their means in the enterprise, but also in order to adopt tests that would enable returns to be more easily checked by examination of records, and make them less liable to inflation

than if a more liberal meaning of 'capital and surplus' had been adopted. * * * "

In view of this conclusive interpretation of the act, it is idle to speculate that the contract of 1919 may have had a value of some sort when it was assigned to the taxpayer; for it is certain that it had no actual cash value within the terms of the statute. The actual transactions of the interested parties through which the corporation acquired its invested capital place this question beyond the realm of doubt. Bloyd and Bachenheimer not only acquired the contract, without cost, but gave it free of charge to the taxpayer corporation. It is suggested by the testimony that the owners of the first corporation were actuated by sentimental motives in gratuitously bestowing the contract upon the individuals named because of obligations of service and friendship which were persuasive, though not of legal validity. But no such considerations entered into the transaction between the stockholders, who formed the Kleeson Company. When Bloyd and Bachenheimer found they could not conduct the business themselves, they sought the assistance of other investors in a purely business way. The owners of the contract were able to secure subscriptions to stock by picturing the profits which had been made in the past, and would probably be earned in the future, through the employment of prison labor. But they got no actual cash or stock, or anything else of value for the assignment of the contract. They stood on the same basis as the other subscribers who exchanged their money for stock of the company at par. If the parties had been of the opinion that the contract then had an actual value of $150,000, it is incredible that it would have been assigned by the owners without any compensation whatever. It would therefore be merely a capitalization of hoped-for profits if the estimated value of the contract arrived at by the interested parties regardless of the hard facts were included in the invested capital. The very uncertainty and exaggeration of values which the act was intended to avoid would be improperly countenanced and approved.

We have assumed, for the purposes of this decision, as contended by the taxpayer, that the prison contract was tangible property within the meaning of section 326a of the Revenue Act of 1918. But, since we have determined the main question in the case adversely to the taxpayer, it is not necessary to decide whether the contract constituted tangible or intangible property, or whether intangible property may be included in invested capital as paid-in surplus, although not exchanged for stock or shares.

The decision of the Board of Tax Appeals is affirmed.