## LOUISVILLE TRUST CO. v. NATIONAL BANK OF KENTUCKY et al.

### No. 693.

District Court, W. D. Kentucky.

Sept. 15, 1932.

See, also, 3 F. Supp. 925.

Robert G. Gordon, Squire R. Ogden, and Gordon, Laurent & Ogden, all of Louisville, Ky., for Louisville Trust Co.

Edward P. Humphrey, of Louisville, Ky., and Nichols, Morrill, Wood, Marx & Ginter, of Cincinnati, Ohio, for Paul C. Keyes, receiver of National Bank of Kentucky, and National Bank of Kentucky.

ANDREW M. J. COCHRAN, District Judge.

This suit is before me upon final hearing and for decree. Plaintiff seeks thereby to recover a personal judgment against the defendant National Bank of Kentucky for the sum of $857,096.50 with interest from October 11, 1930, until paid; to have same allowed as a claim against its assets in the hands of the defendant Paul C. Keyes, its receiver; and that it be adjudged a lien on the Lincoln Bank property in Louisville subject to a vendor's lien thereon in favor of the Lincoln Bank & Trust Company for the sum of $109,000 to secure payment of that sum; and that said property be sold to satisfy that lien.

The right to such personal judgment is based on an alleged oral contract of sale made by plaintiff to the defendant bank, June 21, 1929, of a certain lot or parcel of land on the north side of Market street in Louisville, Ky., upon which a building had recently been erected for use in banking and trust business, which it then owned, for the sum for which judgment is sought, which contract plaintiff claims is evidenced by a memorandum or note in writing signed by it, and possession of which property, it is alleged, was delivered by it to such defendant, October 11, 1930. The defendants have it that it is a suit to compel specific performance of such contract. If such be its real nature it is not so pitched. Pending the suit the property which was the subject of sale was, by the agreement of the parties, exchanged for the Lincoln Bank property subject to the lien for $109,000, with the same right against such property that was had against the property which was the subject of the sale.

The principal defenses relied on are that there was no contract of sale and, if there was, it was not evidenced as alleged. I will first consider whether in fact there was a contract of sale. The determination of this question calls for a detailed statement in chronological order of certain facts, most of which are undisputed. In the early part of 1927 plaintiff was engaged in carrying on a trust and banking business at the southwest corner of Fifth and Market streets in Louisville in a building which it owned. The defendant National Bank of Kentucky was engaged in carrying on a banking business in a building on the northeast corner of Fifth and Main streets in Louisville under a lease. In April, 1927, the two institutions were unified through their stock, all the stockholders in each becoming stockholders in the other. The stock was placed in the hands of trustees, and the stockholders received trustees' participation certificates in lieu of their stock. The board of directors in each was identical, but each retained its separate and distinct identity as a corporation. They were officered by different individuals. John Stites was the president of the plaintiff and James B. Brown of the defendant bank. Mr. Brown was the dominant personality in bringing about this unification. There was in Louisville another institution known as the Louisville National Bank & Trust Company. Between March, 1928, and April, 1929, it had erected the building at 421 West Market street, which, and the land on which it stands, was the subject-matter of the oral contract claimed by plaintiff, at a cost including the land of $857,096.50, exclusive of cost of supervision by its president and interest on the investment. In April, 1929, that institution was merged with plaintiff. Its directors became directors of plaintiff, and its president, Richard Bean, became plaintiff's president. Thereby plaintiff became the owner of No. 421 West Market street property in addition to that occupied by it on the southwest corner of Fifth and Market in which it had been and was then doing business, i. e. of two buildings on Market street; not far apart. It only needed one. That such would be the result of the merger was a substantial objection to it, and objection thereto on this ground was made. The merger was brought about by the defendant bank. It was on its recommendation that it was made. Mr. Brown, president of the defendant bank, met the objection by the assurance that the defendant bank would buy one or the other of the two buildings and by so doing would solve the problem of its home. That this took place was testified to by Mr. Dodd, one of plaintiff's directors, and Mr. Bean, its president. There can be no question as to the admissibility of this testimony and its reasonableness makes certain that it did take place. It is hardly conceivable that plaintiff would

912

have become the owner of two buildings, when it only needed one, except for such assurance, and it was reasonable for the defendant bank to acquire one of them and change its place of business to it. It was occupying as a tenant an old building on the northern edge of the city. Its standing and pretentions called for a more modern building further up in the city. It is not against this having taken place that there is no mention of it in the minutes of the meetings of the board of directors of either institution. The defendants have it that plaintiff claims that the assurance was that the defendant bank would purchase the 421 West Market street building and that it was one of the terms of the consolidation between the plaintiff and the Louisville National Bank & Trust Company. They characterize it as an attempt to inject or interpolate this into the terms thereof covered by a written contract by parol testimony. Such is not plaintiff's claim. Its claim is that the assurance was that the defendant bank would take one or the other of the two buildings, it not being then determined which one, and it does not claim that it was one of the terms of that consolidation. Manifestly it was not. It had no place in those terms. It was simply the inducement which led the plaintiff to go into the consolidation. The significance of this circumstance is in its bearing on the question as to whether the defendant bank did subsequently agree to purchase the 421 West Market street building and, if it did, as an equitable consideration for it standing by its bargain. That such assurance was given is one of the sure things of this case. The entry of the plaintiff into the consolidation cannot otherwise be accounted for and the circumstances were such that it was to the interest for the defendant bank that it acquire one or the other of these two buildings. It is not against its having taken place that plaintiff moved into the building at 421 West Market street on May 24, 1929, held a public reception in the afternoon of that day, and celebrated it with a banquet and speeches at the Pendennis Club that night. It had not then been determined that the defendant bank would take that building, and for aught that appears it was the then contemplation that it would take the other building. It was not until after May 24, 1929, and between that date and June 19, 1929, that it was definitely conceived that the defendant bank would take the 421 West Market street building. It was determined that it should at a conference on that day between Mr. Bean and Mr. Brown. They agreed to recommend to their respective boards that the defendant bank purchase that

property at what it had cost. The two boards met on the afternoon of June 21, 1929, plaintiff's board at 2:30 p. m. and defendant bank's board at 3 p. m. At the meeting of plaintiff's board, Mr. Bean, its president, was authorized to offer the property to the defendant bank at that price. At the meeting of the defendant bank's board Mr. Bean made the offer and that board accepted it. There can be absolutely no question that this took place. It is testified to distinctly and positively by six of plaintiff's directors and Mr. Bean. That the offer was made and accepted by the defendant bank's board is evidenced by the minutes of their meeting. According thereto this took place at that meeting: "The Louisville Trust Company offered to sell to the National Bank of Kentucky the property now occupied by it known as 421 West Market Street for eight hundred & fifty thousand ($850,000.00) dollars, more or less, which offer was accepted. It was agreed that the National Bank of Kentucky shall occupy said property and that the Louisville Trust Company shall occupy the building at the southwest corner of 5th & Market Streets; and that the removal to the respective locations shall be made as soon as the necessary alterations to said building at Fifth & Market Streets are completed."

■ The only thing against the claim that this contract was so authorized and entered into is the denial of Mr. Brown and the absence of any mention on the minutes of the plaintiff of Mr. Bean being authorized to make the offer and the testimony of its secretary that the minutes of the meeting of June 21, 1929, cover all that then took place. No weight can be given to the testimony of Mr. Brown because of its unreasonableness. The fact that Mr. Bean was so authorized did not have to appear on the minutes of the meeting. Parol evidence of what took place is admissible. Bank of U. S. v. Dandrige, 12 Wheat. 64, 6 L. Ed. 552; Pittsburgh, C. & St. L. R. Co. v. Keokuk & H. Bridge Co., 131 U. S. 371, 9 S. Ct. 770, 33 L. Ed. 157; Jacksonville, etc., R. Co. v. Hooper Bridge Co., 160 U. S. 514, 16 S. Ct. 379, 40 L. Ed. 515; U. P. R. Co. v. Chicago, R. I. & P. R. Co., 163 U. S. 564, 16 S. Ct. 1173, 41 L. Ed. 265; 2 Thompson, Corp. § 1296.

The fact that no mention of the authorization was made on plaintiff's minutes may be due to the informal manner in which it came about. It is possible that it may just have been talked over in the meeting and an understanding had that the offer be made, without any further motion and vote to that effect.

The witnesses differ somewhat as to just how it came about, a difference which is not material in view of the time that had elapsed from the transaction at the time they testified.

Something else transpired at the meeting of the board of directors of defendant bank on June 21, 1929, which strengthens the position that on that occasion Mr. Bean made such offer and those directors accepted it, thus bringing about a contract of sale and purchase of the 421 West Market street property. According to the minutes of that board of that date these resolutions were adopted by it:

"Resolved that it is the sense of this Board that a corporation of the character as outlined by the President at this meeting be formed.

"Resolved, further, that the President be and he is hereby requested to report to the Board such details as may be necessary in connection with the organization of said corporation, together with all matters connected therewith."

After May 24, 1929, and before June 19, 1929, the defendant bank's president, Mr. Brown, had a vision of greatness. It was that a corporation be formed to acquire and operate a chain of banks, into which chain the defendant bank and the plaintiff should go, by their stockholders transferring their trustees' participation certificates to such corporation in exchange for stock in it. It was a corporation of this character which Mr. Brown outlined at this meeting and to which these resolutions had reference. The defendants correctly interpret these resolutions as the "Birth of Banco Kentucky." That corporation was subsequently created, organized, and put into operation pursuant to these resolutions. The exact date when this came about does not appear, but it was some time before January 1, 1930. No doubt it was contemplated at the time of the sale that this new institution should be housed in the same building with the defendant bank. It was this proposed venture which rendered it desirable for the defendant bank to acquire the 421 Market street property and which brought about the agreement between Mr. Brown and Mr. Bean on June 19, 1929, and the actual sale thereof by plaintiff to the defendant bank on June 21, 1929, as shown by its minutes. This accounts for plaintiff's willingness, so shortly after it had celebrated its occupancy of the 421 West Market street property with such eclat on May 24, 1929, to surrender it to the defendant bank and go back to its more modest quarters on the southwest corner of Fifth and Market streets. The contract of sale as evidenced by the minutes of the board of directors of defendant bank on June 21, 1929, provided that the execution of it should take effect as soon as the necessary alterations to said building at Fifth and Market streets were completed. Immediately thereafter the plaintiff invited in two architectural firms, one from St. Louis and the other from Chicago, and a third one from New York came without their invitation to submit a layout of the bank floor covering the full alterations to that building in order to make it habitable for the plaintiff. The outcome of this was that a plan of the alterations was provided for plaintiff and adopted and approved by it. This no doubt took some time, just how long not appearing.

In the meanwhile Mr. Brown on behalf of the defendant bank conceived the idea of denationalizing it by converting it into a state bank. Just when this idea was conceived does not appear. Likely some time before October 7, 1929, for on that date a step looking to this end was taken. It remained under consideration until March 21, 1930, when it was definitely abandoned, though it must have been realized that it could not have been carried out much earlier. The thought of so doing seemingly came about because Mr. Brown was fretting under criticisms by the comptroller. If this project had eventuated the defendant bank would have become a state institution the same as plaintiff and the way would be open to a consolidation of the two institutions into one, which was contemplated. But one building in that contingency would have answered its purposes. Of course, as long as it was thought that this project involving this possibility would be carried out, no effort would be made to carry into execution the contract of June 21, 1929. During this time no such effort was made and the plan as to making the alterations in the building on the corner of Fifth and Market streets and adopting it to plaintiff's use was held up. There is nothing in all this that has the slightest tendency to show that no contract was entered into on June 21, 1929, or if there was it was abandoned. Matters were left simply in statu quo, until the outcome of this project was known. If it had materialized it is not unlikely that the contract would not have been carried out. The defendants introduced in evidence a letter from plaintiff's president, Mr. Bean, to Mr. Brown dated November 23, 1929, in which he said: "Will you be kind enough to see Dinwiddie Lampton and try to

get him interested in buying the Louisville Trust Building at Fifth & Market."

It is claimed that this letter shows that in Mr. Bean's mind there was then no contract in existence and that it absolutely proves that there was no contract made in June, 1929. It has no such bearing. Through following the recommendation of the defendant bank plaintiff had on its hands two buildings when it needed but one. It is likely that the building on the corner of Fifth and Market streets was vacant at least so far as the first floor, which it occupied, was concerned. It was natural that Mr. Bean would desire to have plaintiff relieved of this burden. It is not unlikely that it was then thought that the project would go through, an outcome of which would be the consolidation of plaintiff with it, in which case but one building and that at 421 Market street would serve the purpose of the consolidated institution; and thus do away with the execution of the contract of sale of June 21, 1929. This letter has no other significance than this. It does not witness that there had never been a contract or that the contract had been abandoned. It merely witnessed that it was the thought at that time that it was probable that the contract would not be carried out because of a turn in affairs of the two institutions rendering it unnecessary.

This project, as stated, was not definitely abandoned until March 21, 1929. It was practically abandoned on or before January 10, 1930. At that time Banco Kentucky had come into existence. It was the owner of 95 per cent. of the trustees' participation certificates which represented the stock of the two institutions. At a meeting of its directors, who were the directors of the two institutions, a resolution was adopted authorizing the president to appoint a committee to report their recommendations as to whether a saving could not be effected by housing both institutions in the same building, i. e. that at 421 West Market street, the defendant bank thereafter confining its business to commercial banking and plaintiff to trust business only, the report to be made on January 13, 1930. The president appointed Mr. Bean, president of plaintiff, and Mr. Jones, vice president of the bank, as that committee. They reported at a meeting held on that date that they were unable to agree and no action was taken as to the proposed housing. All that was done was to adopt a resolution calling on the two concerns to reduce expenses. A meeting of the directors of plaintiff was held on the same date. At that meeting it was decided "that the two institutions continue to operate as they then were as separate institutions and further that the plaintiff remodel its old building at Fifth & Market streets as rapidly as possible, after the completion of which it shall move into said building and the National Bank of Kentucky move into the new building at 421 West Market street at present occupied by the Louisville Trust Company, the National Bank of Kentucky taking over said building from the Trust Company as previously agreed upon by their respective Boards." The minutes of this meeting were signed by the chairman of the board and its secretary. Here was an express recognition of the contract of sale of June 21, 1929, and that it was still in force.

On January 14, 1930, the regular election of directors for the two institutions were held and separate directors for each were chosen. Thereafter there was no person a member of both boards except Mr. Brown. At a meeting of the plaintiff's board an executive committee was chosen. That committee met February 7, 1930. The minutes of that meeting state that: "Mr. Bean read a prepared interview with newspaper reporters in which announcement was made of the bank's intention to move back to the old building at Fifth & Market and the Bank of Kentucky to move into the building at 421 West Market street and the committee authorized him to furnish the interview to the newspapers."

That interview was published in the issue of the Louisville Herald-Post of February 8, 1930. It was headlined so as to draw attention to it. It set forth in detail the program to be followed by the two institutions and contained therein these words: "The National Bank of Kentucky has purchased the new building at 421 West Market Street, the present home of the Louisville Trust Company."

Thereupon plaintiff proceeded to the remodeling of the building at the corner of Fifth and Market streets, its old home. It completed the work about October 1, 1930, and on October 14, 1930, it vacated the premises at 421 West Market street and moved into the remodeled quarters at Fifth and Market streets. These improvements cost it about $250,000. That it spent this amount of money in remodeling its old home and vacated the premises at 421 West Market street is of overwhelming significance in establishing the fact that it had sold those premises to defendant bank on June 21, 1929. It is inconceivable that it would have so done if there had not been such a sale. In any other view of the matter such conduct on its part

would have been utter recklessness. Furthermore, it establishes that the defendant bank and Mr. Brown, its president, so understood the matter. They must have known that plaintiff was proceeding on this idea and they would not have allowed it to go ahead under a misapprehension in regard to it.

In anticipation of vacating the premises at 421 West Market street on August 25, 1930, the plaintiff wrote defendant bank a letter in which it stated: "A survey just made by the architect and contractors shows that we can get into the building on Oct. 1. Therefore, we are giving you formal notice that the building at 421 West Market street will be ready for you on that date. In the meantime you will want your auditor to verify the cost figures on our building and you will want your attorney to examine the title. We will be glad to furnish these details whenever you are ready for them. We await your instructions."

In a postscript it said: "The first day of the month is an unfortunate time to change locations so let us make the move effective Monday Octo. 8th."

Again on September 22, 1930, plaintiff wrote defendant bank a letter in which it stated: "Attached is our bill against your bank, which we have dated October 6, because on that date we will turn the building over to you. In the meantime I imagine you will want to check up our cost figures and they are available whenever you want them. See Mr. Troxler, please. If you will select your attorney to look after the proper transfer of the property we will be glad to work with him."

The bill attached was for the sum of $857,096.50.

The plaintiff after this wrote the defendant bank four letters as to certain details in regard to the premises based on the idea that there had been a sale and defendant bank was soon to take possession of the premises under it. They were dated October 6, 1930, October 7, 1930, October 7, 1930, and October 10, 1930.

All these letters were received by the defendant bank but none of them were answered. The reason for this was inability on its part at that time to pay for the property according to the contract. That it did not in this condition of things answer these letters and deny that there had been a contract of sale and claim that it was under no obligation to take the property can be accounted for on no other ground than that it could not truthfully make such denial and assert such claim. That there was such contract and defendant bank was under such obligation is further borne out by the fact that defendant bank took possession of the premises on or about October 14, 1930. Beginning on that date it actively conducted the business of renting the safety deposit boxes in the vault. From and after that date it employed and paid the superintendent of the vault and the other employees connected therewith. It furnished the superintendent with printed forms used in the operation of the vault including a form card or application to be signed by the box holder who desired to enter his box, which forms were in its name. The rentals collected from box holders from and after October 14 were credited to the vault department of the defendant bank. These rentals prior to that time were deposited with plaintiff. November 1, 1930, the superintendent reported to the defendant bank the rentals collected for the month of October, 1930, amounting to $1,017.70. Of this amount $528 had been turned over to plaintiff on account of collections to October 14, 1930, and $489.70 to the defendant bank on account of collections from October 14, 1930, to November 1, 1930. The securities deposited by a customer, W. L. Lyons & Co., were transported from the vault to them by the employees of the plaintiff up to October 14, 1930, and thereafter by the employees of the defendant bank. The defendant bank signed and delivered to the Louisville Gas & Electric Company a written contract for steam heating for the following winter. The defendant bank assumed control of this property on October 14, 1930. From the time the plaintiff moved out on that date the board meetings of the defendant bank were held in the board room of those premises. It never, however, moved its banking business to 421 West Market street. At a meeting at the home of Mr. Brown on November 11th, he gave as a reason for the bank not moving that business into that building was that immediately upon its doing so the plaintiff would at once present a bill for the purchase price. Mr. Brown was urged at that meeting to move promptly into that property and on the next day announced in the Louisville Herald-Post that the removal would be made on December 1, 1930, and the announcement was accompanied by a picture of the building on the first page. This did not happen because on November 17, 1930, the defendant bank was closed by the comptroller. At the same time plaintiff was also closed by the state authorities.

These facts which I have recited in great detail establish beyond question that on June

21, 1929, plaintiff and defendant bank entered into a contract by which the one was to sell and convey 421 West Market street property to the other for $857,096.50 and that under that contract the defendant bank took the actual possession of the premises and was in such possession thereof at the time of its failure and on the appointment and qualification of the defendant receiver that possession passed to him.

There is nothing left to be done except to present and consider the grounds upon which defendant claim that the plaintiff is not entitled to the relief which it seeks. There are five of them.

1. That there was no contract between plaintiff and defendant bank for the sale of the 421 West Market street property by the one to the other on June 21, 1929. It is established beyond reasonable doubt that there was such a contract. It is evidenced by the minutes of the meeting of its board of directors of that date. It is testified to positively and distinctly by six or seven reputable persons, by the minutes of the meeting of plaintiff's board of directors on January 13, 1930, at which defendant bank's president and board of directors were present, and by the minutes of the meeting of plaintiff's executive committee of February 7, 1930, and the publication in the newspapers of February 8, 1930. Then come certain facts and circumstances which speak louder than words: The remodeling of the premises at the southwest corner of Fifth and Market streets by plaintiff at a cost of $250,000 with a view of occupying them on the completion of the work and vacating the premises at 421 West Market street. The failure of any one on behalf of the defendant bank to deny that there had been a sale in response to the letters from plaintiff to the defendant bank beginning August 25, 1930. The taking possession of those premises by the defendant bank on October 14, 1930, and the announcement in the newspapers on November 11, 1930, that the defendant bank would on December 1, 1930, move its banking business to those premises. These facts and circumstances are inexplainable on any other basis than that there was the contract of sale made on June 21, 1929. During all this time, i. e. from June 21, 1929, to November 17, 1930, there was not a word said on behalf of defendant bank denying that there had been a contract of sale.

As against this overwhelming mass of evidence establishing the fact of sale there is nothing but the merest quibbling, which calls for no response from me. The defendants will have to accept it that the evidence establishes this fact as absolutely true. It is impossible for them to wriggle out of it.

2. Defendants claim that the requirement of the statute of frauds of this state, section 470, Kentucky Statutes, has not been satisfied. That statute provides: "No action shall be brought to charge any person * * * upon any contract for the sale of real estate * * * unless the * * * contract * * * or some memorandum or note thereof, be in writing, and signed by the party to be charged therewith, or by his authorized agent; but the consideration need not be expressed in the writing; it may be proved when necessary, or disproved by parol or other evidence."

The "party to be charged" is the vendor, and the provision has in view only an action against him on his contract for sale. It does not have in view an action against the vendee for the purchase price. The pertinency of the statute to such an action against the vendee is that if, because of it, no action could have been brought against the vendor, it follows that one cannot be brought against the vendee for want of mutuality. So it is that in every action brought by a vendor of real estate against the vendee for the purchase price the former must make out that the latter could have brought an action against him for the real estate. Such is the case here. The plaintiff is the vendor and it must make out that the defendant bank, the vendee, could have brought an action against it. In order to do this the contract in suit or some memorandum or note thereof must have been in writing and signed by the plaintiff or its authorized agent. The contract was not in writing. It was oral. Hence the question is whether there was such a memorandum or note. It is not necessary that it was made contemporaneous with the oral contract. It is sufficient that it was made any time before this action was brought. Nor was it necessary that it was made with the intent of making a memorandum. Williston on Contracts, vol. 1, § 567.

Nor is it necessary that the memorandum or note show the consideration for the sale. It is sufficient that it shows that there was a contract of sale, that the plaintiff was the vendor and the defendant bank the vendee, and that the subject-matter of the contract was No. 421 West Market street, Louisville, Ky. In the case of City of Murray v. Crawford, 138 Ky. 25, 127 S. W. 494, 496, 28 L. R. A. (N. S.) 680, it was said: "The purpose of the statute is to protect the holders of title

to realty from alleged verbal agreements for its sale." The plaintiff relies on eight distinct writings, to wit, the minute of the meeting of the plaintiff's board of directors on January 13, 1930, which was signed by the chairman thereof and its secretary; the minute of the meeting of the executive committee of the plaintiff February 7, 1930, also duly signed; and the newspaper article to which it refers; and the letters from plaintiff to defendant bank dated, August 25, 1930, September 22, 1930, October 6, 1930, October 7, 1930, October 7, 1930, and October 10, 1930.

That the minute of a meeting of the board of directors of a corporation duly signed satisfies the statute is well settled. 25 R. C. L., Statute of Frauds, § 273; Lamkin v. Baldwin & Lamkin Mfg. Co., 72 Conn. 57, 43 A. 593, 1042, 44 L. R. A. 786; Tufts v. Plymouth Gold Mining Co., 14 Allen (Mass.) 407; Argus Co. v. Albany, 55 N. Y. 495, 14 Am. Rep. 296; Western Timber Co. v. Kalama R. L. Co., 42 Wash. 620, 85 P. 338, 6 L. R. A. (N. S.) 397, 114 Am. St. Rep. 137, 7 Ann. Cas. 667. The case of Cumberland, etc., R. Co. v. Shelbyville, etc., R. Co., 117 Ky. 95, 77 S. W. 690, 25 Ky. Law Rep. 1265, is not against this position. The minutes there did not witness a previous sale. They simply authorized a future sale.

It is urged that these minutes are not sufficient because they were not delivered to the bank. The statute is silent as to whether a delivery is essential. Of course, where the contract is not oral but in writing, delivery of the writing is essential. This is not because the statute requires it, but because it is essential to constitute the contract. But delivery is not essential in order that a memorandum or note of a previous oral sale may be evidence of such sale. Delivery has not the slightest bearing on the question whether the writing bears witness to a sale. I dealt with this matter in the case of Lowther v. Potter (D. C.) 197 F. 196, 197. The question there was whether an undelivered deed which made no mention of a previous sale satisfied the statute. I held that it did not. The judgment was affirmed by the appellate court, 221 F. 881, 882. As to whether delivery of a writing which witnesses a previous sale is essential I had this to say: "I think, also, that the better doctrine is that the statute does not require a delivery of the written memorandum or note. Some cases in other jurisdictions hold that such a statute does require a delivery, but the weight of authority is otherwise."

I opine that on examination it will be found that the cases which are thought to hold delivery to be essential are very largely cases where the question was whether an undelivered deed making no mention of a previous sale was sufficient. Of course, such decisions are not authority against the position that an undelivered deed or any other writing which witnesses to a previous sale is sufficient to satisfy the statute. Such seems to be the view of them held by Mr. Williston. In volume 1 of his work on Contracts, section 579, he says: "So a letter written by the party be charged to his own agent, or any other third person is enough if it contains the terms of the bargain. It should follow that a document retained wholly within the control of the party to be charged may also be a good memorandum. By hypothesis the bargain at common law is complete and written evidence of it alone is necessary. There seems no reason for doubting the sufficiency of an undelivered writing for this purpose and this finds view in many cases." He then says: "It has, however, been held in a number of cases, most of which relate to real estate, that a document remaining wholly unpublished in the possession of the writer could not be used as a memorandum."

The reasoning on which the view that delivery is not essential is based is thus stated in 25 R. C. L., Statute of Frauds, § 313: "The usual ground for holding that the undelivered memorandum is not sufficient is that until it is delivered it cannot operate as a contract and that a paper retained by the party to be charged should not be given the effect of a sufficient memorandum where it is entirely within his power to destroy it and prevent its being used as evidence of the contract. This reasoning, however, is beyond question, which, in this character of cases is not whether there is a written contract, but whether there is sufficient memorandum signed by the party which is evidence that a contract existed or which tends to prove that fact. The evil the statute seeks to guard against is the use of oral evidence to prove the contract. This is obviated by the production of the undelivered memorandum thereof. If produced from defendant's own custody it guards against the mischief that the statute was passed to prevent just as well as if produced from the custody of plaintiff. The plaintiff is the one that is likely to suffer by leaving the evidence in the hands of the defendant, not the defendant himself."

Defendants claim that the Court of Appeals of Kentucky in its latest decisions has construed the statute as requiring delivery of

the memorandum or note and that this court is bound by this construction. The cases relied on are Duteil v. Mullens, 192 Ky. 616, 234 S. W. 192, 193, 20 A. L. R. 361; Gorman v. Gorman, 210 Ky. 65, 275 S. W. 366, 367; Cox v. Stamper, 221 Ky. 745, 299 S. W. 723; Nugent v. Humpich, 231 Ky. 122, 21 S.W. (2d) 153, 155; Klatch v. Simpson, 237 Ky. 84, 34 S.W.(2d) 951, 953. Before these decisions it was the position of that court that delivery of the memorandum or note to the purchaser was not essential. In the case of Kleeman v. Collins, 9 Bush. 460, 461, a letter had been written by one of the defendants from Chicago to his partner or agent in New Orleans specifying the terms of the contract made with plaintiff, the purchaser. There had been no delivery of this letter to him, and yet it was held that the statute was satisfied thereby. The case of Alford v. Wilson, 95 Ky. 506, 26 S. W. 539, 16 Ky. Law Rep. 70, is cited by Williston as an authority for the position that delivery of the memorandum or note is not essential. It was so regarded by the appellate court in the case of Lowther v. Potter. It was cited in support of the position that in Kentucky "delivery of the memorandum to or for the use of the vendee" is not required. In my opinion I undertook to point out that the case did not involve a memorandum or note of a previous oral sale, but whether a written contract had been entered into. The court, however, acted on the idea that it did and on this basis held that delivery was not required. It cited in support of this position the case of Drury v. Young, 58 Md. 546, 42 Am. Rep. 343, which is one of the leading cases holding delivery not essential. In the case of Allen v. Stailey (Ky.) 119 S. W. 755, the court said: "While a written memorandum that will satisfy the statute may be an undelivered writing, or a writing other than the contract which rests upon it, it still is necessary for the parties to have entered into a contract respecting the land." The statement here was a dictum as the question was not involved in the case. In the case of Purtell v. Bell, 179 Ky. 356, 358, 200 S. W. 644, the question was involved and it was decided that delivery was not required. There it was held that a letter from the agent of the owner and vendor to him setting forth the terms of a sale to the vendee satisfied the statute. Such was the state of the decisions at the time of the decision in the first case relied on by defendants. In Kleeman v. Collins and Purtell v. Bell, the question of whether delivery was essential was directly involved, and in Alford v. Wilson it was treated as so involved and in each case it was decided that delivery was not required.

In Duteil v. Mullens the contract was oral and there was no memorandum or note thereof signed by the vendor. The action was by the vendor against the vendee. The plaintiff based his case on two things. One was a check given him by the defendant for $1,000 as first payment on the purchase which stated in its body "as payment on land." The bank on which the check was drawn refused payment on notification from the vendee not to pay it. The vendor had indorsed his name on the back of the check and delivered it to the bank for payment. The other thing was a deed which he tendered to the defendant six months after the transaction took place. It was held that the statute had not been satisfied by either thing. Clearly the decision was right on both propositions. The indorsement of the check did not come up to the requirement inasmuch as the land referred to in it was not identified. The case, therefore, did not involve the question as to whether delivery of a memorandum or note of an oral sale signed by the vendor was required. In the course of the opinion, however, it was said: "A writing evidencing a sale of land makes an obligatory contract when signed by both parties, or when signed by the vendor alone, and is accepted by the vendee." It was said further in referring to the undelivered deed: "This, however, would be unavailing, as a deed alone, to take the transaction out of the statute, would not only have to be signed by the vendor, but it would have to be accepted by the vendee. A verbal contract for the sale of land is not obligatory upon either the vendor or vendee, until a writing evidencing the sale, sufficient to satisfy the statute, has been executed by the vendor and accepted by the vendee."

These expressions confuse what is essential to make a written contract for the sale of land and what is essential in the way of a memorandum or note evidencing a previous oral sale to satisfy the statute. In the first, the writing referred to is one that "makes an obligatory contract"; in the second, reference is had to what is essential to render a tendered deed effective. It must be accepted by the vendee. Indeed, it may be said that what was had in mind was what was essential to constitute a written contract for the sale of land. In so far as the idea is advanced that delivery is essential of a memorandum or note of a previous oral sale to satisfy the statute the expressions are pure dicta.

In Gorman v. Gorman, the question involved was whether a letter written by the vendors to the purchaser and signed only by them, submitting to purchaser for his approval and acceptance ultimate contract for sale of a coal lease that vendors were willing to execute, satisfied the statute. It was held that it did not. The decision was clearly sound. The letter had no reference to a previous sale but to a future one. The court said: "The letter with its inclosures is a proposal to contract upon stated terms and conditions, and cannot possibly be construed as having been tendered or accepted as a written memorandum or evidence of a consummated executory contract." There was no question as to necessity of delivery in the case for there had been a delivery. The letter had been sent by the vendors and received by the vendee. In the course of the opinion the court had this to say: "This court uniformly has construed our statute to mean that, while the written memorandum of the contract need be signed by the vendor only, it must be delivered to and accepted by the vendee before the contract becomes enforceable by either party." In support of this statement the decision in Duteil v. Mullens was cited. The statement was not correct as to the necessity of the delivery of the memorandum. The court had not uniformly thus construed the statute. It had uniformly construed it as not requiring delivery. The court was just not posted as to the state of its decisions. It went no farther back than the loose and confused expression in Duteil v. Mullens.

In Cox v. Stamper it was held that in case of an oral sale of land, vendors signing deed and tendering it to purchaser, who refused to take it, did not satisfy the statute. This was sound and in accordance with what I held in Lowther v. Potter. An undelivered deed not witnessing a previous oral sale never satisfies the statute. In the course of the opinion it quoted what has been before quoted as having been said in Gorman v. Gorman. It involved no question as to whether a memorandum or note satisfying the statute has to be delivered in order to be effective. The court did not decide that it had to be.

In Nugent v. Humpich the vendors were empowered to make a sale of land by the will of a certain decedent, if Gutig and Matilda Humpich should give their consent in writing. There had been delivered to the vendee accepted offers for the purchase of the land signed by both, but differing one from the other. It was held that the vendee was not entitled to specific performance. The decision was sound, but the case did not involve any question as to the necessity of delivery of a memorandum or note to satisfy the statute. In the course of the opinion the court said: "Not only must there be a written memorandum of the contract signed by the party to be charged, but there must be an actual or constructive delivery of it." There was nothing in the case calling for any such expression.

In Klatch v. Simpson there had been a verbal acceptance of a written option to purchase certain real estate given by the owner. It was held that on the acceptance the option became binding on the vendor as the statute did not require the vendee to sign. The case involved no question as to the necessity of delivery of a memorandum or note of a previous oral sale in order to satisfy the statute. In the course of the opinion it was said: "That in the sale of real estate the signature of the vendor is sufficient to bind him if the writing is delivered to and accepted by the vendee, and that such acceptance by the latter need not be in writing, and, of course, no part of his acceptance is required to be signed or subscribed by him." The court here was speaking of the necessity of the delivery of a written option by the vendor in order for him to be bound by an acceptance by the vendee as to which there can be no question. There is nothing in the case upholding defendant's position.

It is these more or less loose expressions in these five decisions which defendants rely on as justifying their position that the Court of Appeals of Kentucky in its later decisions construes the statute as requiring delivery of the memorandum or note of a previous oral sale to be effective. They are nothing more than pure dicta so far as they have bearing on this question. It is not certain that they have in mind what is essential in order that such a memorandum or note may satisfy the statute. It may be that what was had in mind was as to what was necessary in order to make a written contract that will satisfy the statute.

There is nothing in the decisions in the cases of Keith v. Johnson, 271 U. S. 1, 46 S. Ct. 415, 70 L. Ed. 795; C., M. & St. P. R. R. Co. v. Risty, 276 U. S. 567, 48 S. Ct. 396, 72 L. Ed. 703, calling for this court to follow these dicta. This case comes rather within what was said in the case of Edward Hines Yellow Pine Trustees v. Martin, 268 U. S. 458, 45 S. Ct. 543, 545, 69 L. Ed. 1050. It was there said: "When questions affected by the interpretation of a state statute or a local rule of

property arise in a federal court, that court has the same authority and duty to decide them as it has to decide any other questions which arise in a cause, and where state decisions are in conflict or do not clearly establish what the local law is, the federal court may exercise an independent judgment and determine the law of the case. * * * This court has refused to follow a rule established only by a single state decision rendered, after the rights involved in the case in the federal court accrued * * * or a single decision when not satisfied that it is conclusive evidence of the state law."

Here there is not a single decision of the Kentucky Court of Appeals deciding that a memorandum or note of a previous oral sale must be delivered in order to satisfy the statute. All that can be said is that there are several loose and uncertain expressions to that effect in recent decisions which are pure dicta. And the question is whether they should be followed as against two if not three distinct decisions and one dictum to the effect that delivery is not required. I am clearly of the opinion that they should not. The law of Kentucky should be accepted as that held by those decisions. I, therefore, hold that delivery was not essential to the effectiveness of the memoranda or notes relied on here. This can only apply to the two minutes of January 13, 1930, and February 7, 1930. The six letters relied on were delivered.

The question here then comes to this. Do or do not those memoranda and notes establish that previous to the date of the first one, on say June 21, 1929, the plaintiff made an oral sale of 421 West Market street to the defendant Bank? The question really is whether such is the combined effect thereof. It is not essential that such should be the effect of any one of them, if such is the combined effect of them all. It is the case of the bundle of sticks. One may be able to break each stick by itself, but it does not follow from this that he can break the bundle. All these memoranda or notes come from the plaintiff and are signed by it and should be construed together. I do not think that it is arguable that thus considered they do not establish beyond question that such a sale was made. The defendants do not deal with the matter this way. They have acted on the idea that if it can be shown that each one considered by itself does not establish this that ends it.

But how stands it according to this method of procedure? Take for instance the minute of the meeting of plaintiff's board of directors of January 13, 1930. That minute is as follows: "After a long and complete discussion of the affairs of both institutions it was unanimously decided that the Louisville Trust Company and the National Bank of Kentucky continue to operate as they now are, as separate institutions, and that the Louisville Trust Company remodel its old building at Fifth & Market Streets as rapidly as possible, after the completion of which it shall move into said building and the National Bank of Kentucky move into the new building at 421 West Market Street at present occupied by the Louisville Trust Company, the National Bank of Kentucky taking over said building from the Trust Company as previously · agreed upon by their respective Boards."

The defendants attack the integrity of the minute on the ground of certain claimed contradictions and the power to so act at that meeting. These attacks call for no response. Notice will be taken of the two main attacks on it. One is that they do not indicate a previous oral sale in the absence of evidence of the previous agreement referred to and as that was oral it cannot be availed of to fill out the meaning of the minutes. It cannot be told what the minutes mean in the absence of said testimony. Apart from that reference, what they evidence is a purpose on the part of plaintiff to remodel the old building and to move into it as soon as the remodeling should be completed and that upon its so doing the defendant bank is to take over and move into the new building. The contention is that this does not indicate a previous oral sale of the new building to defendant bank by plaintiff, as the reason for taking it over and moving into it. It is said that the words "taking over" are just as consistent with tenancy under a rental arrangement as with an idea of sale. The question comes to this: What do the words "take over" mean? And first what does the word "take" in this connection mean? In the Standard Dictionary its meaning in law is given as "to become possessed of, as by descent or devise." The words "possessed of" here are the equivalent of "ownership," as shown by the example. One who acquires property by descent or devise becomes its owner. In illustration of this meaning this quotation from Tourgee's "Fool's Errand" is given: "His housekeeper, a quadroon woman, claimed his estate under a will duly executed but as it was suggested that she was a slave and incapable of 'taking' under it, the will was set aside." To "take" property or a building, therefore, is to acquire the title to it, not merely the possession of it. This work thus defines the phrase "takeover." It gives

two meanings "to get control of"; "to derive." These words when used as to property or a building involve the idea of acquiring the title thereto. What the minutes in question, therefore, mean is that when the defendant bank moves into the new building it was to acquire the title thereto. This is what was meant by "taking it over." This could not be by any other way than by plaintiff conveying such title to it. As it was out of the question for it to so do as a gift, it must have been in pursuance to a sale thereof made previous to the meeting. The minutes, therefore, witness to a previous sale of the new building to the defendant bank in pursuance to which it was to take it over when plaintiff moved out of it and this without resort to the words "as previously agreed upon by their respective Boards." This is an express statement to the effect that there was a previous agreement by which the defendant bank was to take over the new building, i. e. to acquire the title thereto, which agreement could have been none other than one of sale. So that there can be no possible question but that this minute does witness to the fact that plaintiff had sold the new building to the defendant bank. This covered all the terms of the contract except the consideration, i. e. the price to be paid, and the statute provides that this can be proven by parol testimony. Clearly resort can be had to the defendant bank's own minutes to show what that price was.

The other attack on the minute is its lack of formality. The argument is that because it is not stated in the minutes that a resolution was offered and adopted covering the matter stated therein, what the minute says took place did not in fact take place. Defendant bank's own minute of June 21, 1929, stating the offer of sale and acceptance, was attacked on this ground. Because this matter was not covered by a resolution offered and adopted, it was argued that though the minutes state that the offer was made and accepted this did not in fact take place. This position calls for nothing else than to be stated. It falls of its own weight. This relieves me of any special consideration of the other writings relied on by plaintiff, though I may say that it seems to me that the minutes of February 7, 1930, and the newspaper publication, the letter of August 25, 1930, and that of September 22, 1930, each satisfy the statute.

3. It is urged that the plaintiff is not entitled to the relief it seeks, which is taken to be specific performance of the contract of purchase, because by reason of its voluntary receivership it has disabled itself from performance of its part. The argument runs thus. A party to an executory contract who disables himself from performing his part of the contract breaches it and is liable to the other party for the damages caused by the breach just the same as if he had repudiated it and announced that he would not perform. Furthermore, as he is unable to perform, he has no right to performance on the part of such other party. The plaintiff by reason of its voluntary receivership disabled itself from performance of the contract on its part. Hence it is not entitled to performance on the part of the defendants. The exception to be taken to this argument is in its assumption that this is a suit strictly speaking for specific performance and that there has not been performance by plaintiff, and its claim that by the receivership it was disabled from performance. As to the effect of the receivership, defendants cite the following cases, to wit: Central Trust Co. v. Chicago Auditorium, 240 U. S. 581, 36 S. Ct. 412, 60 L. Ed. 811, L. R. A. 1917B, 580; Pennsylvania Steel Co. v. New York City Ry. Co. (C. C. A.) 198 F. 721; Samuels v. E. F. Drew & Co., Inc. (C. C. A.) 292 F. 734. In the Supreme Court case it was held that bankruptcy proceedings disabled the bankrupt from performing its contract and that such disablement was a breach thereof. In the other two cases it was held that receivership proceedings disabled the defendants from performing their contracts and that such disablements were breaches thereof. In each of the three cases a claim for damages occasioned by the breach was allowed against the estate to the other party to the contract. It is important to take note of the nature of the contract in these cases, disablement of the performance of which was thus brought about. In the Supreme Court case the bankrupt had contracted for the term of five years to transfer baggage and carrying passengers to and from the hotel of the claimant and to furnish livery to its guests. In Pennsylvania Steel Company Case the defendant, a street railroad company, granted to the claimant, an express company, the right to conduct an express business over its lines for a term of twenty years and agreed to furnish cars therefor for a percentage of the gross receipts. In the Samuels Case the defendant contracted to purchase a certain commodity from the claimant. In each of these three cases the contractor was insolvent. There can be no question that it was disabled by the proceeding against it. It could not perform the contract without resources and in each instance it was without resources.

Such is not the case here. There was no disablement to perform on the plaintiff's part. The subject-matter of its contract was No. 421 West Market street. Notwithstanding the receivership proceeding it still had legal title to that property and could convey it to the defendant bank and it was to its interest and that of its creditors that it carry out the contract. Besides, the assumption that plaintiff had not performed and that strictly speaking this is a suit for specific performance is not correct. In this state the vendee in a title bond is treated as the owner of the real estate as much so as if he had received a deed therefor, and the remedy of the vendor, if the purchase money is unpaid in whole or in part, is to bring a suit to enforce the lien which he has thereon by a sale of the property. In the case of Marks v. Tichenor, 85 Ky. 536, 4 S. W. 225, 226, 9 Ky. Law Rep. 125, it was said: "In the sale of land it becomes the real property of the vendee from the execution, delivery, and acceptance of the written contract. 'It is vendible as his, chargeable as his, and capable of being devised or descending as his.' Consequently it is a well-established and reasonable rule that the destruction of buildings thereon by fire, between the time of such contract of sale and the time fixed upon in the contract for the delivery of possession by the vendor to the vendee, must be the loss of the latter and not of the former." In the case of Cottingham v. Firemen's Fund Ins. Co., 90 Ky. 439, 14 S. W. 417, 12 Ky. Law Rep. 409, 9 L. R. A. 627, it was said: "But in this state the purchaser of real estate by title-bond takes the risk of the property. He is the beneficial owner of it, and its loss or destruction falls upon him, and not the vendor." In the case of Benjamin v. Dinwiddie, 226 Ky. 106, 10 S.W.(2d) 620, 621, it was said: "He [i. e., the vendee] was regarded in law as the owner of property subject to his liability for the unpaid purchase price; his vendor, Sengel, holding the legal title in trust for him and as security for the payment of the agreed consideration." In Pomeroy's Specific Performance of Contracts (3d Ed.) § 6, it is said: "In many states a decree for the vendor is by way of foreclosure of his 'lien' for the unpaid purchase price. If the vendee defaults in payment within a time limited by the decree, a sale of the land is directed; any surplus resulting from the sale is awarded to the vendee and any deficiency is made good by execution for the unsatisfied balance of the purchase price."

Because of this position, if possession is delivered to the vendee before payment of the purchase price, the vendor cannot recover the possession in an action of ejectment on the ground of nonpayment thereof. This was so held in the case of Morton v. Dickson, 90 Ky. 572, 14 S. W. 905, 906, 12 Ky. Law Rep. 547. It was there said: "When in equity, and in the possession, the holder of a bond for title is treated as if he held the fee subject to the lien of the vendor, and this necessarily defeats the action of ejectment. Should the vendee repudiate his executory agreement, or if facts are made to appear showing the contract to be void, the action might be maintained; but the failure to pay works no forfeiture of the right of the equitable owner to the land, or invests the vendor with the right to pursue him as he would a trespasser, or a tenant whose term has expired. Where the vendor vests in his vendee an equitable title to land, and places him in possession, although default in payment is made, he has no remedy at law to recover possession by reason of the default."

This position being a rule of property is controlling upon this court. Here plaintiff had delivered possession of No. 421 West Market street to the defendant bank and it had accepted it, though it had not moved its banking business thereto before its failure. It was in possession at the time of the failure and this possession passed to the defendant receiver. The plaintiff could not sue to recover the possession. Its sole remedy was to bring suit for the enforcement of its lien for the purchase price and for a deficiency decree against the defendant bank which would be allowable as a general claim against the estate in the hands of defendant receiver. It was this suit and none other that plaintiff has brought. It must be held, therefore, that this point is not well taken.

4. The next point urged is that specific performance of an executory contract for the purchase of real estate will not be decreed against the receiver of a national bank. This contention is answered by what has just been said. This is not a suit for specific performance strictly speaking. The plaintiff does not ask that the defendants or either of them be compelled to accept a deed for No. 421 West Market street and to pay it the purchase price. The defendant bank is disabled by reason of the receivership from so doing. It has no resources out of which it can make payment. The assets in the defendant receiver's hands belong to the creditors of the defendant bank and cannot be diverted therefrom. As heretofore stated, it is a suit for the enforcement of plaintiff's vendor's lien

and for a deficiency judgment against the defendant bank, allowable as a general claim against such assets. I do not find it necessary to consider in detail the decisions cited in support of this contention. They are none of them in point here.

5. The final point urged is that performance of the contract will be oppressive on defendants and specific performance will not be decreed where such is the case. It is oppressive on account of the great depreciation in value of No. 421 West Market street since the making of the contract. The claim is not that the contract was unfair to defendant bank when made. That it was unfair is not made a special ground for denying plaintiff the relief it seeks. Yet the charge is that it was grossly unfair to the defendant bank. Before considering this fifth point note should be taken of this attack on the contract of sale. It is said that the directors of the two institutions in making the contract "could not be actuated by any motive of independent duty to either institution to see that a fair bargain was effected." It is repeatedly stated that the plaintiff loaded the property in question off of itself onto the defendant bank. It is said that it is conceded that at the time of sale it was not worth $857,000; that this price was several hundred thousand dollars more than its market value; that the only reason for this loading off and on was that plaintiff owned two buildings and only needed one; that there was no chance of loading it onto any other bank in Louisville; and that the only chance of loading it onto any bank was onto the defendant bank, and that because the same board of directors controlled both banks "they could enrich one at the impoverishment of the other without any financial gain or loss." It is said further that it was natural that plaintiff "would like to load one of its buildings on to some one else at a price greatly in excess of the market value" and that the property had a value of $315,000 and to sell it to defendant bank at a price of $857,-000 simply meant the enrichment of plaintiff by over $500,000 and the improverishment of the defendant bank by a similar amount. The claim is put forward that, at the time of the sale, the defendant bank was in a crippled condition and this fact was known to the directors of both institutions. On May 25th, preceding the making of the contract, a national bank examiner had reported to the comptroller that the defendant bank had $4,-000,000 substandard assets, and it is claimed that they then knew this. Likewise at that time plaintiff was in a bad way financially. Both institutions were then headed for fail-

ure. It is said that June 21, 1929, was a "fine time for the Directors of the Louisville Trust Company, who were also Directors of the National Bank of Kentucky, to load over onto the National Bank of Kentucky an additional frozen asset in the amount of $850,000 thereby increasing the sub-standard or frozen assets of the National Bank of Kentucky from four million to almost five million dollars and at the same time increasing the liquidity of the Louisville Trust Company in the same account." The defendants go further and say this: "We do not mean to insinuate that these gentlemen would do such an unbusinesslike and perhaps criminal thing. To have consummated this alleged sale on that date would have been almost criminal and we ascribe to these men no such conduct. They knew that their Bank was in trouble. A way out of trouble was sought. They certainly did not adopt a way which would get them into deeper trouble. They decided to create Banco Kentucky." They proceed in the same strain as follows: "Therefore, we ask what right in law or morals did the Directors of the Louisville Trust Company have to contract with themselves as Directors of the National Bank of Kentucky to increase the frozen assets of the National Bank of Kentucky by the sum of .$857,000, and by so doing increase the liquidity of the Louisville Trust Company to the same extent. As stated elsewhere in this brief, we make no charge of criminal conduct or neglect of duty against these directors, but, if with the knowledge of the financial condition of the National Bank of Kentucky before them that then existed they made such a contract as is contended by the plaintiff charges of criminality and neglect of duty should be made against them."

Though pains are taken to disavow the charge of criminal conduct on the part of the directors of both institutions, as I interpret these expressions, such charge is in reality made. The reason of the disavowal is the claim that the contract of sale was not made. Of course if no contract of sale was in fact made there was no room for such conduct on their part. But if it was made, as it certainly was, the charge of such conduct stands. The defendants relieve the directors of such criminal conduct at the expense of the truthfulness of those of their number who testified to the making of the contract. And the defendants do go so far as to charge that their testimony was untruthful. They say: "The whole thing reflects a built up case after the failure of the two banks, so that the stockholders of The Louisville Trust Company could profit at the expense of the depositors of the Na-

924

tional Bank of Kentucky." They say further that plaintiff "evidently recognized the shortcomings in the written evidence and attempt to supplement, modify and contradict the written evidence by questionable parol testimony." They say further: "This left a terrible gap in the plaintiff's case, and it had to be cured in some way. It could not be cured by any written evidence because there is none in existence, so that the best that could be done was to offer some parol evidence."

■ Now there is absolutely nothing in the evidence to uphold these serious charges. So far as the parol testimony is concerned, it neither supplements, modifies, nor contradicts the written evidence. It confirms the written evidence and the written evidence confirms it, and there can be no question as to its truthfulness. As to the fairness of the contract of sale two things are essential in order to interpret the transaction aright. One is a certain method and the other is a certain spirit. The method is that it must be interpreted from its point of view, i. e., from the known conditions existing at the time of the making of the contract. It is a cardinal rule in the interpretation of a transaction or a document that it should be looked at from such point of view. This method is known as the historical method. According to William Morris, his poem entitled "Earthly Paradise" cannot be understood unless the reader thinks himself back to the latter half of the fourteenth century and in the prologue he helps him to do this in this fashion:

"Forget six counties overhung with smoke,
  Forget the snorting steam and piston stroke,
  Forget the spreading of the hideous town;
  Think rather of the pack horse on the down,
  And dream of London small, white and clean;
  The clear Thames bordered by its gardens green.
  Think, that below bridge the green lapping waves
  Smite some few keels that bear Levantine staves,
  And cloth of Bruges and hogsheads of Guienne;
  While nigh the thronged wharf Geoffrey Chaucer's pen
  Moves over bills of lading."

So, if one would interpret aright the transaction involved here he must think himself back to June 21, 1929, and forget all that passed after that date. Then as to the spirit called for in order that one may interpret aright. In a recent English novel entitled "The Running Footman," which has been well

spoken of, it is said that "the moment one sees with the eye of love is the moment when he sees truly."

Indeed, it has been said that such is the thesis of the book. By the "eye of love" I understand the writer to mean concern—deep concern—for the truth. Such then is the spirit so called for.

■ In this spirit and adopting this method, what is the result? The price agreed to be paid for the property was reasonable and fair. The building had been completed about two months before at that cost, without taking into consideration services in superintending its construction and interest. There is no reason to think that on June 21, 1929, the property was then worth less than that sum. Things were still riding high at that time. The slump in values did not come about until several months after that. The value of $315,000, placed on the property was made in August, 1931, two years after the sale. It was reasonable that the defendant bank should buy the property at that price. It needed the building to do business in, particularly in view of the intention to organize Banco Kentucky. It was the fitting thing for it to acquire the property. So far as its financial condition was concerned it was not then realized or suspected that it was impaired or that there was any danger that it would not be able to carry on. It was not thought that it was in any trouble or that trouble was ahead of it. Though the report of the national bank examiner as to substandard assets was dated May 25, 1929, there is no evidence to the effect that its board of directors or any of its officers knew thereof. The first information in regard thereto which any of its directors had of it was in October following. Nor does it appear to what extent such an amount of substandard assets affected its financial condition. For aught that appears in the record these assets may have been good but slow. It is now unlikely that it would never have been driven to the wall if it had not been for the failure of Caldwell & Co. shortly before it was compelled to close its doors. So far as the plaintiff is concerned there is no evidence that at this time it was in any financial trouble. It is not unlikely that it was the failure of the defendant bank that dragged it down. That notwithstanding its failure there was strength in it is shown by the fact that it was able to reorganize, lift the receivership, and get on its feet again. In addition to all this, the defendant bank was under a moral obligation to the plaintiff to take one of its two buildings off its hands and

it chose to take No. 421 West Market street. On the recommendation of the defendant bank it consolidated with the Louisville National Bank & Trust Company and had on its hands two bank buildings when it only needed one, and it did this on defendant bank's assurance through its president that upon the consolidation it would take one of these two buildings off its hands. This obligation was increased in 1930, when the directors of the two institutions were not the same, in its permitting plaintiff to expend $250,000 in fixing up its old quarters with the view of occupying them and the defendant bank's taking No. 421 West Market street property off its hands, at the price agreed upon pursuant to the contract of sale, without indicating that it was acting upon a wrong notion of things. Because of these matters it would have been highly unfair for the defendant not to have completed the purchase had it remained a going concern. Such then is my conclusion as to the fairness of the contract of sale at the time of the sale.

I come now to a consideration of the fifth point made by the defendants as a reason for not granting plaintiff the relief it seeks, to wit, the great depreciation in value of the property at the time this suit was brought. This position is answered in part by what has been said under the two preceding items. This is not a suit strictly for specific performance. The defendants proceed on the idea that it is and think that if the suit is maintained the defendant receiver will have to pay for the property out of the assets in his hands. The authorities relied on have to do with such a case. No such relief is asked for or will be granted. That depreciation in value of property sold after the date of sale is not a defense to a suit for specific performance is laid down in the following authorities cited by plaintiff. 5 Pomeroy's Equity Jur. (2d Ed.) § 2219; Franklin Tel. Co. v. Harrison, 145 U. S. 459, 12 S. Ct. 900, 36 L. Ed. 776; Cox v. Burgess, 139 Ky. 699, 96 S. W. 577, 29 Ky. Law. Rep. 972. It must be held that this point is not well taken.

An amended answer was filed herein claiming that the title to the property in question was defective by reason of a contract with J. P. Martin & Co. restricting the height of the rear of the building and a lease agreement with Louisville Board of Trade granting to the Louisville Board of Trade the use of the fourth floor of the building for a period of ten years. It was claimed that by reason of these alleged defects plaintiff is not entitled to the relief it seeks. They do not constitute a defense to the action, and as defendants have not argued that they do, I do not feel called on to say anything further in regard to them.

The conclusion of the whole matter is that the plaintiff is entitled to a decree.

